THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE, *v.*
GILLARD, APPELLEE AND CROSS-APPELLANT.

[Cite as State *v.* Gillard (1988), 40 Ohio St. 3d 226.]

(No. 87-352—Submitted October 26, 1988—Decided December 30, 1988.)

*Robert D. Horowitz,* prosecuting

attorney, *Richard D. Reinbold, Jr.* and *John F. Anthony,* for appellant and cross-appellee.

*Gutierrez, Mackey & Gwin Co., L.P.A., John N. Mackey* and *Kathleen M. Tatarsky,* for appellee and cross-appellant.

MOYER, C.J. The state asserts six propositions of law and Gillard's cross-appeal asserts two propositions of law. For the reasons that follow, we sustain the state's propositions of law, overrule Gillard's propositions of law, and reverse the judgment of the court of appeals.

I

The state's first proposition of law stems from a dispute over the procedures to be followed under Crim. R. 16(B)(1)(e), which provides as follows:

"* * * Names and addresses of witnesses shall not be subject to disclosure if the prosecuting attorney certifies to the court that to do so may subject the witness to physical or substantial economic harm or coercion. Where a motion for discovery of the names and addresses of witnesses has been made by a defendant, the prosecuting attorney may move the court to perpetuate the testimony of such witnesses in a hearing before the court, in which hearing the defendant shall have the right of cross-examination. * * *"

Before defendant's trial began, the state sought to certify to the court that one of its witnesses might be subjected to physical harm or coercion if his identity were disclosed to the defense. See Crim. R. 16(B)(1)(e). Although the defense withdrew its motion for discovery, thereby waiving any sanctions for nondisclosure of the witness' name, the trial judge permitted the prosecutor to state, *ex parte,* her reasons for believing that the witness was in danger.

The prosecutor told the judge that John Gillard had been national president of the Outlaw motorcycle gang and had been an active member of that gang in four states. The prosecutor stated that Ronald Webb, who had turned Gillard in, was a potential state's witness whose family had been threatened by Gillard's brothers. She added that the family of another suspect had been threatened with death if the suspect turned state's evidence. Finally, she said that a member of the Outlaws had telephoned another witness to threaten still other witnesses whom the prosecutor did not name.

The state then requested, based on these representations, that Webb's testimony be perpetuated pursuant to Crim. R. 16(B)(1)(e). This request was granted. As provided by the rule, the defense was present during Webb's deposition and cross-examined him.

Crim. R. 16(B)(1)(e) is substantially the same as proposed Fed. R. Crim. P. 16(a)(1)(vi), which was not adopted. See Proposed Amendments to Crim. Rules (1970), 48 F.R.D. 553, 589-590.

The rule provides two distinct alternatives: the state may be relieved of its obligation to disclose the names of endangered prosecution witnesses, or such witnesses' testimony may be perpetuated.[1] However, both forms of relief require the prosecution to show

---

[1] As the Advisory Committee made clear, relief and perpetuation are alternatives. 48 F.R.D. at 605. Logically, where relief from discovery is sought, the procedure must be *ex parte;* otherwise, the defense would learn the very information sought to be concealed, the identity of the endangered witness. It is equally clear that where, as here, perpetuation of testimony is sought, the certification must not be *ex*

the existence of "an undue risk of harm to the witness * * *." 48 F.R.D. at 605. Our concern here is with the judge before whom that showing is made.

In our view, when a judge hears information that a defendant has attempted to harm, coerce, or intimidate an opposing witness, there is an unnecessary risk that the judge will harbor a bias against that defendant. It is true, as the state reminds us, that judges who issue arrest warrants and preside at preliminary hearings are not barred from presiding over the defendant's trial, even though they have already found the existence of probable cause. See *Withrow* v. *Larkin* (1975), 421 U.S. 35, 56. We also recognize that trial judges preside at hearings on motions to suppress evidence, exposing themselves to probative evidence of guilt that may later prove inadmissible, and that this exposure does not taint their impartiality.

However, the information revealed to the judge here was not merely evidence of guilt, as in the examples mentioned above. Rather, it consisted of representations that Gillard was a leader of a motorcycle gang, and that his brothers had engaged, on his behalf and perhaps at his behest, in an organized-crime tactic of intimidating witnesses by threatening the lives of their families.

Clearly, such information is more inflammatory and harder to disregard than the sort of information heard by the judge who issues an arrest warrant or presides over a motion hearing. Where, as here, the certification is *ex parte,* it is especially troublesome, for the defendant has no chance to deny or explain the allegations. It portrays a defendant as a dangerous person and a subverter of the criminal justice system. Moreover, some such information will be placed before the court in every case where the prosecutor makes a certification under Crim. R. 16(B)(1)(e). It is the very purpose of the rule to place such information before the court so that witnesses may be protected. But where the judge who hears and is persuaded to act upon this type of information then presides over the trial, the appearance of fairness is impaired and fairness itself jeopardized.

We hold that, when the state seeks to obtain relief from discovery or to perpetuate testimony under Crim. R. 16(B)(1)(e), the judge who disposes of such a motion may not be the same judge who will conduct the trial.

However, we also hold that violation of the rule we announce today is not *per se* prejudicial. Thus, while it was error in this case for the judge to have presided at trial after hearing the state's certification, we find that error harmless in light of the overwhelming evidence of guilt, including an eyewitness account of the murder, Gillard's subsequent flight, his admission to Webb, and his possession of the murder weapon two weeks before the crime. (See discussion *infra* of the state's fourth proposition of law.)

Moreover, in a capital case, the court is presumed to have considered only the relevant, material, and competent evidence unless the record affirmatively shows otherwise. *State* v. *Post* (1987), 32 Ohio St. 3d 380, 384, 513 N.E. 2d 754, 759. From our examination of the record and the sentencing opinion, it does not appear

---

*parte.* Since the defense will in any event be entitled to cross-examine the witness when he is deposed, there is no reason for an *ex parte* hearing. We clarify this point in view of the trial court's evident confusion in combining these two distinct procedures.

that the trial judge considered any information that was presented solely by the prosecutor's certification. While he did note, in analyzing Gillard's history, character, and background pursuant to sentencing, that Gillard had belonged to several motorcycle gangs and had traveled from state to state in conjunction with his gang membership, that information was elicited without objection at trial.

We find beyond a reasonable doubt that the outcome of both phases of this trial would have been the same had different judges presided at the certification and at the trial. The state's first proposition of law is accordingly sustained.

## II

In its second proposition of law, the state asserts that its actions at trial did not constitute prosecutorial misconduct. Three instances of such alleged misconduct were identified by the court of appeals.

## A

Gillard's nickname was "Dirty John." In opening statement, the prosecution said that, by the time the case was over, the jury would "know exactly why that man is known as Dirty John." On cross-examination, the prosecution asked Gillard: "[T]he next thing that you did was to shoot an innocent sleeping woman * * * and put a bullet in her head, and that's why you're called Dirty John, isn't it?"

The court of appeals condemned these uses of the nickname as improper attempts to impugn Gillard's character. See Evid. R. 404(A)(1). While we agree it was improper, we observe that the defense did not object. The error is therefore waived unless it is plain error. Crim. R. 52(B). Weighing the evidence of guilt against the relative insignificance of the "Dirty John" nickname, it is not clear that,

had the nickname not been improperly used, the outcome of the trial would have been different. See *State* v. *Long* (1978), 53 Ohio St. 2d 91, 97, 7 O.O. 3d 178, 181, 372 N.E. 2d 804, 808.

## B

Gillard was cross-examined at length about his motorcycle gang activity. He admitted that he had belonged to the Chosen Few, Night Riders, and Outlaw gangs. However, he denied having been an Outlaw "enforcer" or a chapter president; denied that the emblems or "colors" worn by members were "drenched in human excrement [or] urine before being worn"; and denied that "One Percenters" are necessarily motorcyclists who shun conventional lifestyles and attitudes.

The court below concluded it was prosecutorial misconduct to ask Gillard these questions without presenting evidence of the allegations implied therein after Gillard had denied them. This view is consistent with our opinions. "The attempt to communicate by innuendo through the questioning of witnesses when the questioner has no evidence to support the innuendo is improper." *State* v. *Williams* (1977), 51 Ohio St. 2d 112, 119, 5 O.O. 3d 98, 102, 364 N.E. 2d 1364, 1368.

However, *Williams* relied in part upon the 1971 version of the American Bar Association Standards Relating to the Prosecution Function, Section 5.7(d), which then provided: "It is unprofessional conduct to ask a question which implies the existence of a factual predicate which the examiner knows he cannot support by evidence." That standard has since been revised, and now states: "It is unprofessional conduct * * * to ask a question which implies the existence of a factual predicate for which a good faith belief is lacking." 1 A.B.A. Standards for Criminal Justice, the Prosecution

Function (2 Ed. 1980), Section 3-5.7(d). See, also, 6 Wigmore, Evidence (Chadbourn Rev. 1976) 371, Section 1808.

The good-faith-basis test is the prevailing test in other jurisdictions. See, *e.g., United States* v. *Katsougrakis* (C.A. 2, 1983), 715 F. 2d 769, 778-779; *United States* v. *Nixon* (C.A. 5, 1985), 777 F. 2d 958, 970. We now think it the better test as well, for "* * * effective cross-examination often requires a tentative and probing approach to the witness' direct testimony, and this cannot always be done with hard proof in hand of every assumed fact." *Hazel* v. *United States* (D.C. App. 1974), 319 A. 2d 136, 139. See, also, Evid. R. 608(B). We hold that a cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists. Since the prosecutor's good-faith basis for asking these questions was never challenged, we presume she had one, see *United States* v. *Holt* (C.A. 7, 1987), 817 F. 2d 1264, 1275, and reverse the holding of the court of appeals.

### C

Finally, the state challenges the holding of the court of appeals that Gillard's post-arrest silence was used against him, in violation of *Doyle* v. *Ohio* (1976), 426 U.S. 610.

Canton Detective Sergeant Michael O'Brien testified that he talked to Gillard in Wellsburg, West Virginia, on January 4, 1985. O'Brien advised Gillard of his constitutional rights and said that he had two warrants for Gillard's arrest. O'Brien testified that Gillard said "that the Canton Police Department was barking up the wrong tree * * * and that the shootings in question had been over a drug deal that had gone sour." O'Brien "asked him to provide details of that to corroborate * * * or to further clarify that statement or who might have been in-

volved and so forth." Gillard refused: "He said *I don't want to talk any more.*" (Emphasis added.)

On January 8, Gillard was returned in police custody to Canton, taken to the police department, and informed of his rights again. After expressing his willingness to talk, he was interrogated by Detective Sergeants Jerry Steiner and Jerry Reynolds. According to Steiner, Gillard "* * * shook his head in the negative and says I really don't know * * * what's going on here * * * but I was at a New Year's Eve Party * * * when this all happened." Steiner asked him where the party had been and who had been there "and [said] we'll definitely check this out and clear you if we have the wrong person. He stated no, never mind, and *he would not give me the location of the party or the names of anyone that was at the party.*" (Emphasis added.)

The defendant argues that this testimony by O'Brien and Steiner violated *Doyle.* The state argues that this testimony did not use Gillard's post-arrest silence against him. Because Gillard did not remain silent, but freely gave his alibi, it was proper to inform the jury that he refused to give details to corroborate that alibi. We agree.

In *State* v. *Osborne* (1977), 50 Ohio St. 2d 211, 4 O.O. 3d 406, 364 N.E. 2d 216, we noted that *Doyle* emphasized the unfairness of inviting a defendant to rely on the *Miranda*[2] warnings' implied promise that his silence cannot be used against him, and then, in fact, using his silence against him. However, we added, a defendant who chooses to talk has not relied on that promise with respect to what he talks about. "If a defendant voluntarily offers information to police, his toying with the authorities by allegedly telling only

---

[2] *Miranda* v. *Arizona* (1966), 384 U.S. 436.

part of his story is certainly not protected by *Miranda* or *Doyle*." *Osborne, supra,* at 216, 4 O.O. 3d at 409, 364 N.E. 2d at 220.

The United States Supreme Court has, we believe, confirmed our reading of *Doyle*. In *Anderson* v. *Charles* (1980), 447 U.S. 404, the court rejected a "formalistic understanding of 'silence' " whereby "[e]ach of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version." *Id.* at 409. *Anderson* is distinguishable from the case at bar in that Gillard's post-arrest statements are not inconsistent with his trial testimony. However, the Sixth Circuit has rejected such a narrow reading of *Anderson*. *United States* v. *Crowder* (C.A. 6, 1983), 719 F. 2d 166, 172 (*en banc*).

Moreover, *Anderson* approvingly cited *United States* v. *Goldman* (C.A. 1, 1977), 563 F. 2d 501, a case virtually on all fours with this case. Like Gillard, Goldman "chose to make an exculpatory statement * * *." *Goldman, supra,* at 503. Thus, Goldman could not claim that he relied on *Miranda* warnings, and his refusal to give the names of people to whom he referred in his story and who could have corroborated his statement could be used to discredit that statement. "If [a defendant] talks, what he says *or omits* is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to." (Emphasis added.) *Vitali* v. *United States* (C.A. 1, 1967), 383 F. 2d 121, 123, quoted in *Goldman* at 503.

Clearly, *Doyle* was not violated here. The state's second proposition of law is sustained.

### III

In its third proposition of law, the state argues that it was not misconduct for the prosecutor to discuss the possibility that William Gillard and Tim Fohrenbach may be indicted.

During voir dire, the prosecutor told the veniremen that the evidence would show "that this defendant's brother, William Gillard, and a friend of his by the name of Tim Fohrenbach were also involved in these crimes. However, they have not yet been indicted. * * * They are still under investigation." She went on to ask: "Do you all understand and accept that there is only one person on trial in this courtroom and it is this defendant, John Gillard?"

While cross-examining William Gillard, the prosecutor asked: "You understand that the Grand Jury * * * is still at this time considering evidence against you?" According to the court of appeals, these statements and questions implied to the jury that the prosecutor knew facts outside the evidence and the issues in the trial.

The jury might have drawn from such statements the inference that William Gillard and Tim Fohrenbach were also involved in the murder. However, their involvement was relevant to the issues at trial and evidence of it was introduced. We see no prejudice to John Gillard. Accordingly, the state's third proposition of law is sustained.

### IV

The state argues, in its fourth proposition of law, that the admission of testimony regarding John Gillard's firing of a gun two weeks before the murders, if error at all, was not plain error.

The state introduced evidence that Gillard had fired a .380 automatic into a wall inside the Fireball Express, a bar in Canton, in December 1984, approximately two weeks before the murders. This was relevant because, in April 1985, a .380 caliber casing was

found at the Fireball Express. That casing was ejected from the same gun that ejected the casings found at the murder scene. The state argued that the casing found at the bar came from the gun Gillard used in December, and that Gillard's gun was therefore the murder weapon.

Although agreeing that this testimony was relevant, the appellate court held that the state elicited "excessive detail showing the accused to be generally a vicious and dangerous man."

Timothy Steph, the owner of the Fireball Express, testified that he asked Gillard to pay for some chairs that he had broken in a previous fight; that Gillard responded by grabbing Steph in a headlock while someone else hit him in the face; that Scott Dryden went to Steph's defense; and that when Steph left the bar, the fight ended.

Dryden testified that, about an hour and a half to two hours later, a second fight broke out. Gillard, saying "I'll break this up," pulled an automatic pistol and fired it into the air. Leroy Ensign grabbed Gillard, restraining him. Gillard kept the gun, which Dryden identified as a .380 caliber automatic.

Bernadean Davlin's testimony differed from Dryden's in one significant respect. Davlin testified that Gillard pointed the gun at someone and was going to shoot him when Ensign grabbed his hand and held it up in the air.

Davlin's testimony depicts Gillard in a bad light since it suggests that Gillard was about to kill the other person. However, because it was Ensign, one of the victims in this case, who kept him from shooting, the testimony was obviously relevant to motive.

The testimony regarding Gillard's attack on Steph, however, was irrelevant and tended to portray him as a violent man. However, Gillard failed to object to this testimony, and we decline to hold it plain error. Evidence of his involvement in a mere barroom brawl cannot be seen as highly prejudicial where he already stood accused of two aggravated murders. The state's fourth proposition of law is sustained.

## V

In its fifth proposition of law, the state asserts that it properly cross-examined defense witness William Gillard on his conviction of discharging a firearm within the Canton city limits.

The state introduced testimony that William Gillard had fired a handgun into the air at 213 Kennet Court before the murders. The state's theory was that he did so to find out whether the sound of gunfire would draw the attention of the police. On direct examination, William Gillard denied possessing a gun at any time on December 31 or January 1.

The prosecutor asked William Gillard on cross-examination whether "in fact you plead [sic] and were found guilty of * * * firing that same shot * * * that Mr. Postlewaite [sic] testified to." The court overruled an objection on the ground that the direct examination had opened the subject. William Gillard was then asked whether he had been found guilty of discharging a firearm and whether he had been jailed upon his conviction.

Crim. R. 11(B)(2) did not bar this attempt to use the no contest plea. That rule provides that a plea of no contest "is not an admission of [the defendant's] guilt * * * and * * * shall not be used *against the defendant* in any subsequent civil or criminal proceeding." (Emphasis added.) This clearly refers to "the defendant" who entered the plea — in this case, William Gillard. The plea was not used

"against him," as he was not a party to this litigation.

The court of appeals noted that the state elicited an admission from William Gillard that he was jailed after the finding of guilt. This was irrelevant. However, the error was clearly harmless, since William Gillard had already admitted that he had been convicted of the charge.

The court of appeals also observed that William Gillard had earlier been asked whether he knew that the grand jury was still investigating him and whether John Gillard's attorney had represented him at the preliminary hearing. As the state emphasizes, however, defense objections to both questions were sustained. Moreover, the court instructed the jury to disregard the first question and admonished the prosecutor in the jury's presence after the second. We find no prejudice to Gillard, and accordingly sustain the state's fifth proposition of law.

## VI

In its sixth proposition of law, the state argues that the trial court was not required to declare a mistrial *sua sponte*. This proposition of law appears to refer to that portion of the appellate court's opinion dealing with, *inter alia,* Gillard's ninth assignment of error below, which challenged the trial court's failure to act *sua sponte* to control alleged prosecutorial misconduct. In addressing that assignment of error with several others, the court of appeals held that certain unspecified rulings that ordinarily would have been within the discretion of the trial court were prejudicial error in this case because they might have been "influenced by the information furnished to the trial court" by the state under Crim. R. 16(B)(1)(e). (See our discussion of the state's first proposition of law, *supra.*)

We cannot agree. Since the record does not indicate that any of the court's rulings were affected by this information, we presume that none was. *State* v. *Post, supra.* The state's sixth proposition of law is therefore sustained.

## VII

In Gillard's first proposition of law on cross-appeal, he argues that the court, the prosecutor, and his own counsel violated his rights by informing the jury that its verdict of death would be only a recommendation that the court would not have to follow. We have repeatedly rejected this argument. See, *e.g., State* v. *Clark* (1988), 38 Ohio St. 3d 252, 259, 527 N.E. 2d 844, 852. We summarily overrule it here. See *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 3, 520 N.E. 2d 568, 570.

## VIII

In his second proposition of law, Gillard argues that his trial counsel was ineffective in the penalty phase of the trial.

A defendant claiming ineffective assistance of counsel must show that counsel's performance was deficient and that the deficiency caused prejudice. *Strickland* v. *Washington* (1984), 466 U.S. 668, 687. Prejudice exists where it is reasonably probable that the result would have been otherwise absent the alleged errors; a reasonable probability is one sufficient to undermine confidence in the outcome. *Strickland* v. *Washington, supra,* at 694.

After Gillard was convicted, counsel continued to insist that he was innocent and presented no other mitigating factors. This strategy was within the "wide range of reasonable professional assistance." *Strickland* v. *Washington, supra,* at 689. "Residual doubts" of a capital defendant's guilt are properly considered in mitigation. *Lockhart*

v. *McCree* (1986), 476 U.S. 162, 181; accord *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 142, 22 OBR 203, 218-219, 489 N.E. 2d 795, 811. The record does not show that there were any other mitigating factors for counsel to present, nor does it show that counsel failed to look for them.

Thus, Gillard's attempt to compare this case to *State* v. *Johnson* (1986), 24 Ohio St. 3d 87, 24 OBR 282, 494 N.E. 2d 1061, fails. In *Johnson,* the record showed a complete failure to investigate. We will not infer such a failure solely from the presentation of no mitigating factors. Indeed, we emphasized in *Johnson* that "the mere failure to present mitigating evidence at the penalty phase of a capital trial does not itself constitute proof of ineffective assistance of counsel * * *." *Id.* at 91, 24 OBR at 286, 494 N.E. 2d at 1065.

Gillard also notes that counsel did not object when the state offered all the exhibits admitted in the guilt phase to be readmitted in the penalty phase. However, such an objection would not have been well-taken. See *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 282-283, 528 N.E. 2d 542, 552.

Gillard states that counsel expressed support for the existence of the death penalty. However, this argument may well have enhanced counsel's credibility with the jury.

We find no deficiency in counsel's performance; therefore, Gillard's second proposition of law is overruled.

## IX

Having reversed the judgment of the court of appeals, we remand this cause so that court can perform its independent review of the appropriateness and proportionality of the death penalty.

A capital defendant, under R.C. 2929.05, has a right to independent review by both the intermediate appellate court and the Supreme Court. See *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768, paragraph four of the syllabus. "[T]he multi-tiered review structure * * * eliminates the arbitrary imposition of the death penalty." *State* v. *Glenn* (1986), 28 Ohio St. 3d 451, 453, 28 OBR 501, 502, 504 N.E. 2d 701, 705. Since Gillard has not yet had the safeguard of independent review by the court of appeals, we must remand the cause to that court with instructions to perform such review.

*Judgment reversed and cause remanded.*

SWEENEY, LOCHER, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.

HOLMES, J., concurs in the judgment.

HOLMES, J., concurring in the judgment. I would concur in the judgment of the majority in reversal of the court of appeals. However, I would reinstate the judgment of the trial court.