OPINION
On February 8, 1999, the defendant-appellant, William Kent, was tried without a jury and found guilty of menacing by stalking, under case number C-98CRB-42437A, and telephone harassment, under case number C-98CRB-42437B. On March 25, 1999, Kent was sentenced to one hundred eighty days' confinement, with one hundred seventy-six days suspended and credit for four days previously served; a fine of $500 and costs; and probation for three years on the menacing-by-stalking charge. The court found the offense of telephone harassment to be one of similar import to that of menacing by stalking and did not, accordingly, separately convict Kent for harassment. On April 12, 1999, Kent filed, prose, his notices of appeal.
Through his retained counsel, Kent has given us four assignments of error. The first is:
 The trial court erred to the prejudice of appellant by failing to recuse itself from the case following the mid-trial tender in open court of a plea offer, which was not consummated, in violation of the right of appellant to due process of law under the Fourteenth Amendment to the Constitution of the United States, and Art. I. Sec. 16 of the Ohio Constitution.
On February 8, 1999, after the appropriate colloquy had been conducted by the court with Kent and his trial counsel, Kent's written waiver of trial by jury was entered upon the journal, opening statements were made, and the prosecution called its primary witness, the victim named in the complaints, to testify.
The substance of the charge of menacing by stalking was this:
 William R. Kent [then 40-41 years of age,] on or about August 7, 1998 to Sept. 30, 1998, in Hamilton County and State of Ohio, did, by engaging in a pattern of conduct, cause Brandi Miller to believe that he would cause physical harm to her and caused her mental distress.
The complaint setting forth the violation of R.C. 2917.21
(telecommunications harassment) made these allegations:
 William R. Kent on or about August 7, 1998 to Sept. 30, 1998, in Hamilton County and State of Ohio, did knowingly make multiple telephone calls with purpose to harass to Brandi Miller a misdemeanor of the 1st degree.
Brandi Miller testified that on August 7, 1998, she was fifteen years of age, her birthdate being August 27, 1982. She stated that she was leaving a department store in a shopping mall when a man ultimately identified as Kent ran up to her, asked her to stop and then asked for her name. Believing the man to be part of the mall security force seeking information about the contents of a bag she was carrying, Brandi gave her name. She testified that Kent "then proceeded to tell me that the reason he stopped me was because he wanted to talk to me. He wanted to get my phone number. He wanted to date me. I was too beautiful, he couldn't just let me leave without talking to me."
She refused to give Kent her telephone number, but he persisted in his conversation even after Brandi told him that she was "only 15." Kent, according to her testimony, responded, "[W]ell, if you're only 15 does that mean that you would make me wait until you're 18 to date you, or could I just date you now [?]" In context, she said, "When I told him I was 15, he said I would be driving soon and could he just buy me a car."
All of this caused her to feel unsafe and to retreat from the open area of the mall into a store, where she returned a recent purchase to a cashier, who requested her home telephone number. As she complied, Brandi saw Kent standing near her as she wrote down that number. Kent then said to her, "[N]ow I have it. I can call you all the time." She summarized the effect of the experience in these words: "I was scared. I knew that it was not normal for someone of his age to want to be involved with a 15-year-old girl. And I was especially scared when I found out that he did have my address and my phone number."
Brandi then called her stepmother, Leslie Miller, to bring her home. Mrs. Miller gave the following testimony on direct examination by the prosecution:
 When I walked up to her, I could tell she was white and her hands were clammy. Because I grabbed her hand and I was, like, are you okay? Oh, my, I looked at her and said, are you okay? She was kind of, had her eyes down and kind of looking around. I said, do you see the man that was following you around? And she said, no, she didn't.
Two weeks later, Kent began what developed into the series of calls specified in the complaint for telephone harassment. In the first call, Kent persisted in asking questions about Brandi's personal life, telling her,
 He knew that I lived with my dad and step-mother. And he said, so, do you like living with your dad and step-mom? Should I talk to your dad and try to hook him back up to your mother? And then he said, so you're a cheerleader. Do you think I can see you do a split sometime, because I would really like to see that. He knew I was a Virgo, obviously, he knew my birthday. He said, so I know all about you Virgos.
Brandi answered the prosecutor's question of how the call affected her emotionally by testifying,
 I was terrified. I had no idea how he had found, no idea how he had found out all that information. I knew I had never told him. And when I told my parents, I stopped going anywhere alone. I stopped staying at home alone. If I was home alone I was very nervous. Any, like, any little sound I would panic.
Brandi was a cheerleader for the Madeira High School football team. When Kent told her in a telephone call that he had been to all the games, she hung up and Madeira police were notified, but they were unable to locate Kent in the crowd of hundreds attending one game. Again, she answered an inquiry about her emotional state by saying,
 I was constantly looking over my shoulder. The last thing on my mind was the football game. All the administration of the school were immediately notified by my advisor, and they all came to the game. I usually, after the football games the team and the cheerleaders go out to Skyline. But I went straight home after the game. I had someone drop me off and walk up to my door with me. I was terrified that this man would follow me, hurt me. I didn't know what he was capable of.
When the direct examination was concluded, counsel for Kent said to the court,
 Judge, after much conversation in this matter[,] I have discussed this situation with my client who has also included his girlfriend, and at this point what we would like to do is tender a plea of no contest to the stalking charge. It's my understanding the State, the county would be requesting dismissal of the telephone harassment.
The prosecutor indicated her agreement, and the court explained to Kent the meaning and the consequences of a plea of no contest, including the maximum sentences. Kent said in response, "I can't admit," and the trial resumed.
The thesis upon which the first assignment rests is that where, as in the case sub judice, the credibility of the parties and the state of mind of the defendant are crucial issues, the "failure" of the court to recuse itself and order the case retried by another jurist constitutes a denial of due process. Kent's counsel on appeal stresses that it is not contended here that the trial court harbored any personal bias, prejudice or animosity toward Kent. However, counsel argues that because the court was aware that, at one point, Kent had contemplated pleading no contest to menacing by stalking, thus admitting the existence of all the essential elements of that offense, the court could no longer impartially weigh the evidence.
To support that contention, Kent cites State v.Gillard (1988), 40 Ohio St.3d 226, 533 N.E.2d 272. There, Chief Justice Moyer wrote for a unanimous court in its review of a capital murder conviction in which the trial proceedings had been conducted under Crim.R. 16(B)(1)(e), as a result of the prosecution's certification that one of its witnesses might be subjected to harm or coercion if his identity were disclosed to the defense. The trial court was given ex parte details of the defendant's past associations with a motorcycle gang and connections to death threats made to potential witnesses for the state. The Chief Justice wrote,
 In our view, when a judge hears information that a defendant has attempted to harm, coerce, or intimidate an opposing witness, there is an unnecessary risk that the judge will harbor a bias against the defendant. It is true, as the state reminds us, that judges who issue arrest warrants and preside at preliminary hearings are not barred from presiding over the defendant's trial, even though they have already found the existence of probable cause. See Withrow v. Larkin (1975), 421 U.S. 35, 56, 95 S.Ct. 1456, 1469, 43 L.Ed.2d 712. We also recognize that trial judges preside at hearings on motions to suppress evidence, exposing themselves to probative evidence of guilt that may later prove inadmissible, and that this exposure does not taint their impartiality.
Gillard, supra at 229, 533 N.E.2d at 276.
In context, the opinion states, "We hold that, when the state seeks to obtain relief from discovery or to perpetuate testimony under Crim.R. 16(B)(1)(e), the judge who disposes of such a motion may not be the same judge who will conduct the trial. However, we also hold that violation of the rule we announce today is not perse prejudicial." Id.
In our case, the record contains no indicia of bias by the trial court adverse to Kent, and guided by the admonition inGillard that merely hearing evidence does not per se prejudice an accused, we hold that the trial court in this case was under no duty to recuse itself sua sponte. There is no basis in this record upon which to conclude that the discussion of a plea of no contest by Kent, of which the court was aware, prejudiced Kent. This is particularly so because such a plea was neither formally proffered nor received of record. Resultantly, the first assignment is without merit and is overruled.
The second, third and fourth assignments are, respectively:
 The judgments of conviction are contrary to law and to the due process clause of the Fourteenth Amendment to the Constitution of the United States in that there was insufficient evidence adduced to establish each and every element of each offense beyond a reasonable doubt.
 The judgments of conviction are contrary to the manifest weight of the evidence.
The trial court erred to the prejudice of appellant by denying his motions for judgment of acquittal pursuant to Crim.R. 29.
Kent's second assignment broaches a pivotal question of law, viz., was the evidence adduced in the state's case-in-chief sufficient to permit the trier of fact to overrule his first motion for acquittal. The pertinent, seminal case is State v. Bridgeman
(1978), 55 Ohio St.2d 261, 381 N.E.2d 184, the syllabus of which provides, "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."
Kent's trial counsel lucidly posed this issue to the trial court at the appropriate juncture of the proceedings:
 The statute requires that the offender acts knowingly — in order to be convicted under the statute, the offender must be aware that his conduct will probably cause the other person to believe the offender will cause him or her physical harm or mental distress. The reality, the fear has to be reasonable, Judge.
Kent's counsel in this appeal adopts and expands this argument by submitting the following:
 Simply put, there is insufficient evidence in this record to justify a conviction of menacing by stalking. Certainly, the state did not prove beyond a reasonable doubt that Appellant caused Miller to believe that he would cause her physical harm. Nothing that Appellant said to Miller, either in their sole encounter in person, at the mall, nor on the few telephone calls which followed, supports that conclusion.
 In defining menacing by stalking, R.C. 2903.211
requires that the offender "knowingly cause another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." R.C. 2901.22(B) defines the culpable mental state of "knowingly": "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2903.211(C)(2) defines "mental distress" as "any mental illness or condition that involves some temporary substantial incapacity or
mental illness or condition that would normally require psychiatric treatment." (Emphasis added.)
Kent's trial counsel, in his argument at the close of all the evidence, neatly summarized Kent's defense: "Judge, the problem with it [the state's case], it's a story. It's fiction. The problem with this case is you have to decide who to believe."
What the evidence to which the court was entitled to give credence demonstrates is that a soon-to-be sixteen-year-old female was accosted suddenly by a forty-one-year-old man who was a total stranger. That man asked for her telephone number so that he could "date" her, flattered her, and followed her when she moved away to another location where he surreptitiously noted her telephone number. This behavior was followed by a series of unwanted telephone calls that were abruptly terminated by the girl, and by an unwanted gift in an envelope bearing no return address. Adroit police work in utilizing telephone company records led to Kent's identification and arrest. For his part, Kent admitted to police the initial contact at the mall, admitted some of the telephone calls, and admitted the gift, all of which he thought to be innocuous.
Repeatedly, both on direct examination and aggressive cross-examination, Brandi described the effects that Kent's behavior produced on her. They were set forth graphically in this exchange with Kent's trial counsel:
 Q. All right. Did you have any belief that the defendant would cause you physical harm?
A. Yes, I did.
Q. What was that based on?
* * *
A. His angry —
MR. ARENSTEIN: Objection.
THE COURT: Overruled.
 A. — angry response when I told him I was going to hang up the phone. He screamed, I wouldn't do that if I were you. His persistence in continuing to call me and mail me birthday presents. His way, the way that he told me he had been to all the games. If he was looking to do that, I didn't know what he wasn't willing to do. And I didn't know what would happen, I didn't know if he would follow me, rape me, I wasn't sure what he had in mind.
 Q. How did this, the defendant's conduct affect your life style?
A. It changed dramatically. I was constantly looking over —
MR. ARENSTEIN: Objection, she's been asked this before, Judge.
THE COURT: Sustained.
 Q. What did you do differently in your daily routine * * * as a result * * * of the defendant's pattern of conduct?
 A. I stopped going anywhere alone. I made it a point not to be home alone. If my parents were at work, I would invite a friend over so I wouldn't be alone. And if I couldn't get someone I would ask a relative, an adult to come pick me up. I didn't stay home alone at all.
 And I was very nervous in any situation being alone, walking from school, after school to the car, it would make me nervous. I could hardly handle being at football games as crowded as they are and knowing that he had claimed to have been to all the games.
In State v. Smith (1998), 126 Ohio App.3d 193, 709 N.E.2d 1245, appeal not allowed (1998), 82 Ohio St.3d 1430, 694 N.E.2d 980, the Court of Appeals for Mahoning County was presented with an issue of law parallel to that confronting us in this review. The assignment of error in Smith was as follows:
 The court erred to the prejudice of appellant in permitting this charge of menacing by stalking to go to the jury and not sustaining appellant's post-verdict motion to arrest judgment/acquittal/judgment n.o.v. when the manifest weight of the evidence failed to satisfy the requirements of R.C. 2903.211 on two grounds: (1) no showing of a pattern of conduct to cause reasonable belief of physical harm in addition to an alibi defense for one of the alleged incidents and (2) no corroboration of victim's alleged mental distress with a showing of psychiatric/psychological treatment as required by the statute.
We read R.C. 2903.211 in the same way it was construed by the court of appeals in Smith, supra. It was not necessary for Kent to have knowingly caused mental distress to the degree that Brandi Miller required professional care, treatment or counseling, or to have actually caused her physical harm. As the General Assembly has chosen to phrase the statute, Kent's behavior, admitted by him in part, was sufficient to cause Brandi Miller to believe, as she said she did, that Kent would visit some form of physical harm upon her. Even more compelling are the details of the mental distress Kent caused and the changes in the pattern of her life brought about by her mental state.
In State v. Tichon (1995), 102 Ohio App.3d 758,658 N.E.2d 16, appeal dismissed (1995), 73 Ohio St.3d 1450,654 N.E.2d 986, the Court of Appeals for Summit County held, interalia, that the testimony of the victims named in a complaint alleging two counts of menacing by stalking and one count of aggravated menacing was sufficient to support the finding that those victims suffered mental distress as an element of the stalking offenses, and that expert testimony was not required to prove that element. See State v. Schwab (1997), 119 Ohio App.3d 463, 695 N.E.2d 801;State v. Bilder (1994), 99 Ohio App.3d 653, 651 N.E.2d 502, appeal not allowed (1995), 72 Ohio St.3d 1518, 649 N.E.2d 278; see, also, Paugh v. Hanks (1983), 6 Ohio St.3d 72,451 N.E.2d 759.
The record in our case, viewed in the light given by both Smith and Tichon, persuades us that the evidence was sufficient to support the findings that Kent knowingly caused Brandi Miller to believe that he would cause her physical harm in the future, that her belief was reasonable, and that Kent did cause her mental distress within the meaning of R.C. 2903.211. Without doubt, Kent's persistence in placing unwanted telephone calls, given credence in context with the other evidence, was sufficient to demonstrate a violation of R.C. 2917.21. Therefore, we overrule Kent's second assignment of error.
The third assignment, that the judgment of conviction is contrary to the manifest weight of the evidence, is overruled on the authority of State v. Thompkins (1997), 78 Ohio St.3d 380,678 N.E.2d 541; State v. Waddy (1992), 63 Ohio St.3d 424,588 N.E.2d 819; State v. Barnes (1987), 25 Ohio St.3d 203,495 N.E.2d 922; and State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212.
The fourth assignment, that the court erred in denying Kent's motions for acquittal pursuant to Crim.R. 29, is overruled for the reasons given supra with respect to the state of the evidence at the juncture of the case when those motions were made, and upon the authority of State v. Bridgeman, supra, which this court has applied consistently. See, e.g., State v. Martin
(1983), 20 Ohio App.3d 172, 485 N.E.2d 717.
None of the assignments is well taken, and the judgment of the Hamilton County Municipal Court is accordingly affirmed.
Judgment affirmed.
 ________________________________ SHANNON, Judge.
 DOAN, P.J., concurs, PAINTER, J., concurs separately.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.