OPINION
{¶ 1} Defendant-appellant Oshea Woods appeals from his conviction and sentence for Robbery, following a jury trial. Woods contends that his trial counsel was ineffective for having failed to object to testimony that he made certain statements to a police detective, because there had been no showing that those statements were made after a proper waiver of Woods's privilege against self-incrimination under the Ohio and United States constitutions. Woods also contends that the admission of this testimony constituted plain error for the same reason. We agree with the State that it had made the requisite showing at a suppression hearing at which the admissibility of these statements was determined. The trial court was not required to revisit this issue at trial.
 {¶ 2} Woods further contends that the trial court abused its discretion when it imposed a three-year sentence of imprisonment. We find no abuse of discretion. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} In October, 2005, between 8:00 and 9:00 p.m., Thomas Search, a pizza delivery driver, was attacked by two men after delivering a pizza in Dayton. After Search was thrown to the ground, one of the attackers searched his pockets. Unable to find *Page 3 
any money or other valuable property, the attackers fled the area. Search returned to the pizza store and contacted the police to report the incident.
 {¶ 4} Search later identified Oshea Woods, in a photo-spread, as one of the men who had attacked him. Another witness to the attack, Jessie Hall, also identified Woods in a photo-spread as one of the attackers.
 {¶ 5} Woods was arrested. Dayton Police Detective William Elzholz interviewed Woods. Woods read, understood, and waived his rights underMiranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Woods denied involvement in the robbery, but admitted that he was present. He claimed he was only a witness to the robbery.
 {¶ 6} Woods was charged by indictment with Robbery. He moved to suppress any statements he made to law enforcement personnel. A hearing was held on the motion to suppress, following which the trial court overruled the motion.
 {¶ 7} A jury found Woods guilty as charged. The trial court entered a conviction for Robbery, and sentenced Woods to a term of imprisonment of three years, to be served concurrently with a seventeen-month sentence in another case. From his conviction and sentence, Woods appeals.
 II {¶ 8} Woods's First Assignment of Error is as follows:
 {¶ 9} "DEFENSE COUNSEL'S FAILURE TO OBJECT TO DETECTIVE ELZHOLZ'S TESTIMONY CONCERNING STATEMENTS WOODS DID OR DID NOT MAKE WITHOUT A SHOWING THAT HE KNOWINGLY, VOLUNTARILY, AND *Page 4 
INTELLIGENTLY WAIVED HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 10} The record does not support the predicate for this assignment of error. The record reflects that Woods filed an Amended Motion to Suppress on December 15, 2005, in which he moved "to suppress any statements made to any law enforcement personnel." In his memorandum in support of that motion, Woods argued that the statements he gave to law enforcement personnel were made in violation of his privilege against self-incrimination under both the Fifth and Fourteenth amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.
 {¶ 11} A suppression hearing was held on January 18, 2006. At the beginning of that hearing, the motion was referred to as a motion to suppress photo spread identifications, and testimony was taken on that subject. However, during the hearing, the State also presented evidence concerning the statements Woods gave to Detective Elzholz, in the presence of Detective C. W. Ritchey. Elzholz testified as follows:
 {¶ 12} "Q. Okay. When you met with the defendant, what did you do first?
 {¶ 13} "A. Introduced myself and told him I wanted to complete a Pre-Interview form or Rights form with him.
 {¶ 14} "Q. I'm going to show you what's been marked as State's Exhibit 4, shown to Defense.
 {¶ 15} "A. This is a Pre-Interview form that we executed together on October 25th, 2005 at 9:15 a.m. at the police station.
 {¶ 16} "Q. Okay. And are you in a private room with the defendant at that time?
 {¶ 17} "A. I'm sorry? *Page 5 
 {¶ 18} "Q. Are you in a private room with the defendant at that time?
 {¶ 19} "A. Yes, that's correct, yes.
 {¶ 20} "Q. Is there anybody else present?
 {¶ 21} "A. I believe Detective C. W. Ritchey was present, yes.
 {¶ 22} "Q. Okay. What's your procedure for using that sheet with the defendant?
 {¶ 23} "A. After introducing myself to Oshea, I asked him to spell his first, middle and last name. He supplied me with a phone number and an address as well as his race, sex, age, his date of birth and social security number. I then told him you're going to be interviewed in regards to the crime of robbery. Before we ask any questions, you must understand your rights. I then asked Oshea to read number one out loud to me, which he did.
 {¶ 24} "At the conclusion of reading that out loud I asked him if he understood it, and he verbally acknowledged `yes.' And then I asked him to initial the right, which he did.
 {¶ 25} "Q. On that Rights form there's five enumerated rights; is that correct?
 {¶ 26} "A. Yes, ma'am.
 {¶ 27} "Q. And did you go through that same procedure with each right?
 {¶ 28} "A. Yes, that's correct.
 {¶ 29} "Q. And did you read them verbatim, word for word as they appear on that sheet?
 {¶ 30} "A. He read them word for word as they appear on the sheet. I read the waiver portion beneath the rights.
 {¶ 31} "Q. And after the defendant read each right, did he follow the same *Page 6 
procedure of signing next to it — initialing next to it?
 {¶ 32} "A. Yes, that's correct.
 {¶ 33} "Q. Okay. Did the defendant, as he's going through rights one through five, have any trouble reading?
 {¶ 34} "A. No.
 {¶ 35} "Q. Was he able to complete reading each five rights?
 {¶ 36} "A. Yes, that's correct.
 {¶ 37} "Q. Did he have any questions?
 {¶ 38} "A. No.
 {¶ 39} "Q. Did he indicate any confusion?
 {¶ 40} "A. No, he did not.
 {¶ 41} "Q. Once he completed reading each of the five rights and initialing next to each one, what happens next?
 {¶ 42} "A. I read the waiver portion of the Rights form to him, asked him if he understood it, and he said he did. I asked him how many years of schooling he completed, and he said eight. And he had a GED, and he said he was presently attending Life Skills on Main Street. I asked him if he was willing to talk to me and he said he was, and he signed the Rights form and I also signed it.
 {¶ 43} "Q. Okay. And when you talk about the waiver portion, is that captioned on your form Waiver of Rights?
 {¶ 44} "A. Yes, ma'am, that's right.
 {¶ 45} "Q. And did he have any question or confusion about what he was reading at that time? *Page 7 
 {¶ 46} "A. I read the waiver portion, ma'am.
 {¶ 47} "Q. I'm sorry. Did he have any questions or confusion about what was being read to him?
 {¶ 48} "A. No.
 {¶ 49} "Q. Did he [sic] defendant agree to speak to you?
 {¶ 50} "A. Yes, he did.
 {¶ 51} "Q. And about how long did you speak with him?
 {¶ 52} "A. Shortly. Less than a half hour. Probably closer to 15 minutes.
 {¶ 53} "Q. During that time did he ever tell you he wanted to stop talking to you?
 {¶ 54} "A. No, ma'am.
 {¶ 55} "Q. Did you or any other Dayton officer ever abuse or mistreat the defendant?
 {¶ 56} "A. No, ma'am.
 {¶ 57} "Q. Did he ever ask for anything — a drink of water, to use the bathroom, for which he was denied?
 {¶ 58} "A. No, ma'am.
 {¶ 59} "Q. Did the interview end at his request or because you were done interviewing him?
 {¶ 60} "A. Because we were done interviewing him.
 {¶ 61} "* * * *
 {¶ 62} "Q. Okay. Other than in that interview room, did you ever speak with the defendant about this crime?
 {¶ 63} "A. No, ma'am. *Page 8 
 {¶ 64} "Q. Or any other crime.
 {¶ 65} "A. No, ma'am. He did ask me about another crime, and I told him another detective would be addressing that with him."
 {¶ 66} Woods cross-examined Elzholz on the subject of the statement Woods gave to Elzholz.
 {¶ 67} At the conclusion of the suppression hearing, Woods's attorney made a brief argument about the photo-spread issue, after which the trial court asked: "And how about the statement?" Woods's counsel then made a brief argument that Woods likely did not understand that he was waiving his right to remain silent, the prosecutor responded, and Woods's counsel replied, on the subject of whether Woods had waived his privilege against self-incrimination. The trial court then orally, on the record, denied the motion to suppress, in its entirety.
 {¶ 68} Whether evidence is admissible is a question for the trial court to determine. Woods submitted to the trial court the issue of the admissibility of his statements to Detective Elzholz, including, specifically, the issue of whether the statements were obtained without a waiver of his privilege against self-incrimination, when he moved to suppress this evidence. Woods obtained a ruling from the trial court on this issue.
 {¶ 69} At the suppression hearing, the State made a showing that Woods had knowingly, voluntarily, and intelligently waived his privilege against self-incrimination. Thus, the record contradicts Woods's assertion that the State had failed to make such a showing, upon which his claim of ineffective assistance of trial counsel is predicated.
 {¶ 70} In the course of his argument in support of this assignment of error, *Page 9 
Woods contends that his trial counsel should have objected to certain testimony Elzholz gave on cross-examination, during the trial. Elzholz had testified that Woods told him that Woods saw two people attack the pizza man, but that Woods refused to identify or provide a description of the two attackers and refused to say where they had fled after the attack. The cross-examination continued as follows:
 {¶ 71} "Q. But to have a witness say that they didn't see where someone ran off or something to that effect, that's not particularly unsual.
 {¶ 72} "A. I think it's unusual if someone's being accused of a crime of this nature that they wouldn't give me much more data, if they had it.
 {¶ 73} "Q. But I'm not asking you that question.
 {¶ 74} "A. I would be trying to tell an investigator anything I could help him solve it if it wasn't me and that didn't appear to be the case.
 {¶ 75} "* * * *
 {¶ 76} "Q. So to have someone give sketchy information is not particularly indicative of anything, is it? Really.
 {¶ 77} "A. Again, if I was accused of something —
 {¶ 78} "Q. Well, I'm not talking — but you're not accused. It's someone —
 {¶ 79} "A. He was.
 {¶ 80} "Q. Right.
 {¶ 81} "A. And he gave me sketchy information, and I would think he would want to be more helpful."
 {¶ 82} It is well established that when an accused chooses not to exercise his right to remain silent, the fact that he omits some facts or details from his account is a *Page 10 
matter concerning which the State may comment. State v. Gillard (1988),40 Ohio St.3d 226, 533 N.E.2d 272; State v. Osborne (1977),50 Ohio St.2d 211, 364 N.E.2d 216. Therefore, we reject any argument Woods may be making that his trial counsel was ineffective for having failed to object to, or perhaps even having invited, comments concerning details that Woods left out of his statements to Detective Elzholz. There would have been no basis for an objection along these lines.
 {¶ 83} Woods's First Assignment of Error is overruled.
 III {¶ 84} Woods's Second Assignment of Error is as follows:
 {¶ 85} "THE ADMISSION OF DETECTIVE ELZHOLZ'S TESTIMONY CONCERNING STATEMENTS WOODS DID OR DID NOT MAKE IS PLAIN ERROR WHICH DETRIMENTALLY AFFECTED WOODS' RIGHT TO REMAIN SILENT."
 {¶ 86} In this assignment of error, Woods essentially re-casts his ineffective assistance of counsel claim, asserted in his First Assignment of Error, as a claim of plain error. For the reasons set forth in Part II, above, we find no error in this connection, plain, or otherwise. Woods's Second Assignment of error is overruled.
 IV {¶ 87} Woods's Third Assignment of Error is as follows:
 {¶ 88} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO DETERMINE THAT THE SENTENCE IMPOSED WAS THE MOST EFFECTIVE METHOD TO COMPLY WITH R.C. 2929.11." *Page 11 
 {¶ 89} Woods concedes that a trial court, in imposing sentence, is vested by R.C. 2929.12(A) with discretion to "determine the most effective way to comply with the purposes and principles of sentencing set forth in section R.C. 2929.11." Woods characterizes these purposes as protecting the public from future crime by the offender and as punishing the offender.
 {¶ 90} Woods recognizes that the trial court indicated on the record that it had considered the purposes and principles of sentencing set forth in the Ohio Revised Code, but complains that the trial court did not set forth any express discussion of how it came to its conclusion that the sentence it imposed was the most effective way of achieving those principles and purposes. Woods cites no authority for the proposition that a trial court is required to put on the record its reasons for imposing a particular sentence, and we are not aware of any authority for that proposition.
 {¶ 91} The trial court imposed a sentence of three years. The possible sentences the trial court could have imposed for this offense, a second-degree felony, were two, three, four, five, six, seven, or eight years. Although the sentence imposed was not the minimum possible sentence, it was on the low end. We have reviewed the record, including the pre-sentence investigation report, and we find no abuse of discretion.
 {¶ 92} Woods's Third Assignment of Error is overruled.
 V {¶ 93} All of Woods's assignments of error having been overruled, the judgment of the trial court is Affirmed. *Page 12 
DONOVAN, J., concurs.