OPINION
Defendant-appellant, Levander Davis, appeals from the May 3, 2001 judgment entry of the Franklin County Court of Common Pleas, sentencing him to an aggregate term of eighteen years to life. For the reasons that follow, we reverse and remand for a new trial.
On September 7, 2001, appellant was indicted on Count 1, aggravated murder in violation of R.C. 2903.01; Count 2, murder in violation of R.C. 2903.02; and Count 3, improperly discharging a firearm at or into a habitation or school in violation of R.C. 2923.161. All three counts contained firearm specifications. Beginning on April 23, 2001, the matter was tried before a jury where appellant testified.
This case arose out of the shooting death of Terry Felder in the early morning hours of October 8, 1999. On October 7, 1999, Tonshell Butler threw a birthday party for her friend and roommate Erica Thompson. Tonshell and Erica both resided at 365 Miller Avenue, Apartment A, Columbus, Ohio.
Erica testified that the party did not officially start until about 11:00 or 11:15 p.m. (Vol. III, Tr. 289.) Once the party started, the apartment filled up with a lot of people. Erica was sitting on the end of the couch when a commotion started. Although Erica did not see what happened, she testified that she believed that Tyana Butler smacked Corey Barnes in the back of his head, at which point Corey pulled out a gun and pointed it at Tyana. (Vol. III, Tr. 293.) Erica testified that Bennay Butler became involved in the commotion and Bennay indicated that Corey pulled a gun out and pointed it at Tyana. (Vol. III, Tr. 295.) Terry then got involved and said that Corey did not pull a gun out on Tyana. Erica testified that Corey and Terry began arguing against Tyana and Bennay. (Vol. III, Tr. 295.) Erica testified that Tyana told Shawn Butler that Corey pulled a gun out on her. (Vol. III, Tr. 295-296.) The next thing Erica saw was Terry staggering backwards. Erica did not know if Shawn or Bennay pushed Terry. At that point, she saw both Shawn and Terry with guns. Erica testified that she did not stick around to see who was going to fire the first shot. (Vol. III, Tr. 297-298.) Instead, Erica got up, crawled out the front door, and ran down the steps. Erica testified that she heard gunshots from more than one gun and bullets hitting the walls. (Vol. III, Tr. 298, 306.) Erica further testified that, as she was running out of the building, everyone was screaming and running also. (Vol. III, Tr. 307.)
Erica testified that, when she ran outside, she saw appellant shooting a gun. (Vol. III, Tr. 311.) Erica testified that she did not see in what direction appellant was shooting the gun. (Vol. II, Tr. 310.) Erica testified that appellant "might have told me to get out of the way. He might have told me to move. He might have told me to run." (Vol. III, Tr. 308.) Erica started to run and then she heard gunshots. Erica testified that Terry was behind her coming out of the building, and when she turned around, she saw Terry falling to the ground on the bottom of the steps. (Vol. III, Tr. 312.) Erica testified that Terry was killed somewhere between the apartment door and the front door of the building. (Vol. III, Tr. 314.) Erica further stated that she honestly did not see who shot Terry. (Vol. III, Tr. 317.) However, when the prosecution asked Erica about her interview with the police, Erica testified that she told the police that appellant shot Terry. (Vol. III, Tr. 321.) Furthermore, during her interview with the police, Erica picked out a photo of appellant and wrote across the bottom of the photo, "`He shoot [Terry].'" (Vol. III, Tr. 321.) Erica testified that appellant was shooting in the direction of the door and that it was appellant's firing of a gun that caused Terry to fall to the ground. (Vol. III, Tr. 323-324.) Erica additionally testified that "the only people that was close enough to get him [Terry] was me or Vander [appellant]. I didn't have no gun." (Vol. III, Tr. 322.)
Willie Felder, Terry's older brother, also testified on behalf of the state. Willie testified that he saw Shawn push Terry out of Bennay's face, and then reach into his pocket for something. (Vol. II, Tr. 95.) Willie testified that he never saw a gun in Shawn's hand because he turned around and started running out the door. (Vol. II, Tr. 155.) Willie testified that, as he, Terry and Corey started to run out the door, Terry stopped and started shooting into the house. (Vol. II, Tr. 95.) Willie testified that he saw someone come from outside and start shooting at Terry. (Vol. II, Tr. 95.) Willie told Corey that someone was shooting at Terry but, by the time Corey responded to Willie, Terry was shot. Willie testified that, at that point, Corey started shooting inside the apartment. (Vol. II, Tr. 96.) Willie picked up his brother and drove him to the hospital.
Willie testified that he could not identify the person that shot Terry, but he was positive that he knew the person who shot Terry was wearing a black blue jean outfit, with a dark-colored shirt. (Vol. II, Tr. 110-111.) Willie stated that he did not know who the person was until he went to the hospital and "put two and two together" and figured everything out. (Vol. II, Tr. 116.) He testified that he asked the partygoers who were at the hospital who had on the black jean outfit. (Vol. II, Tr. 116.) Willie testified that Krishauna told him that it was appellant who wore the black jean outfit. (Vol. II, Tr. 116.) Willie figured appellant was the same person inside the apartment, as well as the same person outside the apartment who shot Terry.
Krishauna testified that, although Willie, Terry and Corey never told her that they were in a gang or acted like they were in a gang, she believed that they were members of a gang known as the Bloods because they always wore the color red. (Vol. III, Tr. 201-202.) However, when asked if she thought they were in a gang, Krishauna stated "no, not really." (Vol. III, Tr. 202.) Krishauna also stated she believed that Shawn and appellant were members of a gang known as the Crips, because they wore the color blue. (Vol. III, Tr. 201, 203.) Krishauna stated that anyone she saw that had on red she assumed was a Blood, and anyone she saw wearing blue she thought was a Crip. (Vol. III, Tr. 203.) She testified there were more Bloods at the party than Crips. Id. Krishauna stated that she was friends with both groups of people. (Vol. III, Tr. 203-204.)
Krishauna testified that, once the commotion started and after Shawn pushed Terry and Terry fell over the arm of the couch, Shawn pulled out his gun. (Vol. III, Tr. 211.) When Terry got up to face Shawn, Shawn had his gun pointed at Terry. Terry then pulled out his gun, and both Shawn and Terry started shooting. Krishauna testified that, as the two were shooting, she was hiding behind the front door looking at what was going on. (Vol. III, Tr. 213.) Krishauna testified that, after Shawn and Terry were done shooting, Terry ran out the front door of the apartment and she followed behind him. (Vol. III, Tr. 214.) When she got to the doorway of the apartment, she looked at the stairs and then turned her head. Krishauna heard two or three gunshots coming from the outside to the inside of the building, but she never turned around to see if Terry was shot. Instead, she ran back behind the front door in the apartment. Krishauna testified that, even though she did not see Terry get shot, she knew that he did not get shot inside the apartment. (Vol. III, Tr. 216.) Krishauna testified that she never saw appellant with a gun. (Vol. III, Tr. 235.)
Appellant testified that, on the night of October 8, 1999, he "had on some dark blue jeans with a gray shirt with orange stripes on both of the sleeves and gray Timberland boots." (Vol. IV, Tr. 114.) Appellant testified that he did not have a jacket on. (Vol. IV, Tr. 114.) Appellant stated that, when Shawn and Terry started shooting at each other, he exited out of the apartment, jumped down the steps and ran towards Bryden Road. (Vol. IV, Tr. 136.) After he started to walk down Bryden Road, he saw police cars heading in the direction of the apartment. Appellant testified that he knew his cousins were still back in the apartment, so he decided to turn around and walk back to the apartment. (Vol. IV, Tr. 138.) When he arrived at the apartment, the police were there. Appellant testified that he talked to a female police officer, which informed him that someone named "[Terry]" had been shot. (Vol. IV, Tr. 139.) Appellant testified that, after about a minute, he realized there was nothing that he could do, so he walked back up Bryden Road to Miller Avenue, and then to his cousin's house on Burgess Avenue. (Vol. IV, Tr. 139.) On the stand, appellant testified that he did not have a gun with him at the party. (Vol. IV, Tr. 114, 136, 139; Vol. V, Tr. 482, 499.)
On May 3, 2001, the jury returned guilty verdicts on all three counts of the indictment. The trial court merged Count 1 of the indictment (aggravated murder with the firearm specification) with Count 2 of the indictment (murder with firearm specification) and sentenced appellant to fifteen years to life. On Count 3 (improperly discharging a firearm at or into a habitation or school with specification), the trial court sentenced appellant to seven years incarceration to be served concurrently with Counts 1 and 2. Furthermore, the trial court sentenced appellant to an additional three years for use of a firearm, which appellant was ordered to serve consecutively with Counts 1, 2 and 3, for a total aggregate sentence of eighteen years to life. It is from this judgment entry that appellant appeals, raising the following three assignments of error:
ASSIGNMENT OF ERROR NUMBER ONE:
 THE STATE ENGAGED IN MISCONDUCT WHEN IT IMPROPERLY INDICATED, THROUGH INADMISSIBLE HEARSAY AND INNUENDO, THAT THE DEFENDANT HAD CONFESSED TO COMMITTING THE HOMICIDE TO A FRIEND OF HIS. THIS VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHTS TO CONFRONT AND CROSS-EXAMINE WITNESSES AND HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL. THE STATE FURTHER ENGAGED IN IMPROPER CONDUCT WHEN IT ATTEMPTED TO ESTABLISH THAT THE DEFENDANT WAS A MEMBER OF A GANG WHEN THIS WAS NOT A MATERIAL FACT. DEFENDANT'S COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THIS MISCONDUCT.
ASSIGNMENT OF ERROR NUMBER TWO:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTION AND THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED.
ASSIGNMENT OF ERROR NUMBER THREE:
 THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO CHARGE THE JURY ON ALL MATTERS OF LAW NECESSARY FOR THE INFORMATION OF THE JURY IN RETURNING A VERDICT.
In his first assignment of error, appellant argues that the prosecutor, during cross-examination, engaged in improper behavior and tactics in an attempt to convince the jury of appellant's guilt. Appellant contends that the prosecutor attempted to establish and convey to the jury that appellant confessed to his cousin, Shawn Butler, that he killed Terry, and that he was a gang member. Appellant asserts that the prosecution's misconduct deprived him of a fair trial and his conviction should be reversed.
At the outset, we note that appellant's counsel did not object to the prosecutor's line of questioning on cross-examination that appellant now raises as his first assignment of error on appeal. The failure to object to evidence at trial constitutes a waiver of any challenge on that evidence on appeal, except for plain error. State v. Robertson (1993),90 Ohio App.3d 715, 728. To constitute plain error, "'[t]he error must be obvious on the records, palpable, and fundamental'" such that it should have been apparent to the trial court without objection. State v. Tichon (1995), 102 Ohio App.3d 758, 767. Moreover, plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper actions. State v. Waddell (1996), 75 Ohio St.3d 163, 166. Notice of plain error is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Phillips (1995), 74 Ohio St.3d 72, 83; State v. Ospina (1992), 81 Ohio App.3d 644, 647. Appellant's first assignment of error will be examined under a plain error standard of review to determine whether his substantial rights were adversely affected as to undermine the fairness of the guilt determining process. State v. Lewis (July 21, 1998), Franklin App. No. 97APA09-1263, unreported, citing State v. Swanson (1984), 16 Ohio App.3d 375.
Appellant's substantial rights cannot be prejudiced where the remaining evidence, standing alone, is so overwhelming that it constitutes appellant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously. State v. Williams (1988),38 Ohio St.3d 346, 349-350; Columbus v. Hamilton (1992),78 Ohio App.3d 653, 657; State v. Williams (1983), 6 Ohio St.3d 281
(where constitutional error exists in the admission of evidence, such error is harmless beyond a reasonable doubt if the remaining evidence constitutes overwhelming proof of the defendant's guilt).
In State v. Treesh (2001), 90 Ohio St.3d 460, 480-481, the Supreme Court held that the standard for prosecutorial misconduct is:
 * * * [W]hether the comments and/or questions were improper, and, if so, whether they prejudiced appellant's substantial rights. State v. Lott (1990), 51 Ohio St.3d 160, 165 * * *. Evid.R. 611(B) provides that cross-examination shall be permitted on all relevant matters and matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." State v. Acre (1983), 6 Ohio St.3d 140, 145 * * *. Trial judges may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation. See Delaware v. Van Arsdall (1986), 475 U.S. 673, 679 * * *.
In his brief, appellant cites to different pages of the transcript where the prosecutor engaged in improper cross-examination. We begin our focus on the following exchange between the prosecutor and appellant, where appellant asserts that the prosecutor improperly questioned him about confessing to the murder of Terry:
 Q. WHEN DID YOU TALK TO HIM [SHAWN BUTLER] ABOUT THE SHOOTING?
A. IT WAS LATER THAT DAY.
 Q. DO YOU RECALL MAKING STATEMENTS TO HIM ABOUT YOUR INVOLVEMENT IN THE SHOOTING?
A. NO, I DON'T.
 Q. YOU DIDN'T TELL HIM — DID HE EXPRESS CONCERN TO YOU THAT HE MIGHT HAVE SHOT [TERRY]?
 A. YEAH, HE WAS SAYING — HE WAS LIKE, I DON'T KNOW WHO DID IT. ME NEITHER.
Q. AND WHAT YOU SAID WAS, "ME NEITHER"?
A. YEP.
Q. YOU DIDN'T SAY, "YOU DIDN'T SHOOT HIM, I DID"?
A. NO, I DIDN'T.
Q. YOU DIDN'T TELL SHAWN BUTLER THAT?
A. NO, I DID NOT.
 Q. DID YOU TELL SHAWN BUTLER THAT YOU GOT RID OF THE GUN IN THE ALLEY?
A. NO, I DIDN'T.
Q. YOU NEVER SAID THAT TO HIM?
A. NO, I DIDN'T.
Q. ARE YOU SURE?
A. I'M POSITIVE.
 Q. WOULD MR. BUTLER — YOU DON'T KNOW WHETHER HE WOULD BE LYING ABOUT THAT OR NOT, DO YOU?
A. I DON'T KNOW WHAT HE WOULD DO.
Q. YOU HEARD THE TESTIMONY OF MARK HARDY, RIGHT?
A. YES, I DID.
Q. THAT CRIMINAL GUY, THE BALLISTIC GUY?
A. UH-HUH.
Q. YOU HEARD THE TESTIMONY OF THE CORONER; CORRECT.
A. YES.
 Q. WOULDN'T YOU AGREE AFTER THOSE TWO PEOPLE TESTIFIED THAT SHAWN'S NOT THE ONE THAT KILLED TERRY?
A. YES, I WOULD.
 Q. YOU DON'T REMEMBER GETTING A GUN BACK FROM K-B A COUPLE OF DAYS BEFORE THE HOMICIDE?
 A. I NEVER GAVE HER A GUN SO HOW COULD I GET ONE BACK FROM HER? [Vol. V, Tr. 475-476.]
* * *
 Q. YOU NEVER SAID TO HIM [SHAWN BUTLER], "I SHOT [TERRY]"?
A. NO, I DIDN'T.
 Q. YOU NEVER DESCRIBED THE SHOOTING SOUNDS, THE POP, POP, POP, POP, POP, POP TO SHAWN?
A. WHAT?
 Q. YOU NEVER DESCRIBED THAT TO HIM, THE POPPING NOISE YOUR GUN MADE AS YOU WERE SHOOTING [TERRY]? YOU NEVER DESCRIBED THAT TO HIM?
 A. HOW AM I GOING TO MAKE A NOISE WITH A GUN THAT I DIDN'T HAVE?
Q. YOU NEVER TOLD HIM THAT YOU PUT THE GUN IN THE ALLEY?
A. NO, I DIDN'T. [Vol. V, Tr. 478.]
Once again, appellant's counsel failed to object or challenge the prosecutor's line of questioning. Additionally, the prosecutor failed to provide any extrinsic evidence to rebut appellant's denial of an alleged confession of killing Terry. Appellant asserts that the prosecutor's cross-examination could have easily led any reasonable jury to believe that he was guilty. "It is improper for an attorney, under the pretext of putting a question to a witness, to put before a jury information that is not supported by the evidence." State v. Smidi (1993),88 Ohio App.3d 177, 183.
The Supreme Court has held that a cross-examiner may ask a question if he has a good-faith basis to do so. State v. Gillard (1988),40 Ohio St.3d 226. Where the prosecutor's good-faith basis for asking the question was never challenged, the court presumed that the prosecutor had one. Id. at 231, State v. Gentry (Nov. 19, 1991), Franklin App. No. 91AP-370, unreported. However, we have recognized that a good-faith basis for questioning does not end the inquiry. State v. Hunt (1994),97 Ohio App.3d 372, 375.
In Hunt, the prosecuting attorney, in at least four instances, engaged in improper conduct. In three instances, the prosecutor posed leading questions to the state's witnesses as to whether the witnesses felt threatened by defendant and were afraid to testify in the present case. In each instance, objections were raised and the trial court sustained each objection. On cross-examination, the prosecutor accused the defendant of taking gasoline to the witnesses' homes and threatening to blow up the place. In this instance, an objection was raised, but the trial court overruled the objection because the prosecutor stated that she had a good-faith basis to ask the question. However, the prosecutor failed to put forth extrinsic evidence to establish that fact. As a result, this court held that, where the core of the case rests with the credibility of the defendant and witnesses, the prosecutor's conduct was prejudicial and deprived appellant of a fair trial. Hunt, at 376-377. See Sidney v. Walters (1997), 118 Ohio App.3d 825, 829 ("an attorney may not present information that is not in evidence to a jury under the pretext of asking questions").
Although in this case appellant's counsel never pressed the prosecutor to present its good-faith basis for questioning appellant, the failure to do so "does not change the nature of the question asked and it does not render proper a question that was improper." Hunt, at 376. The questioning of appellant by the prosecutor assumed facts that were not introduced into evidence. DR 7-106(C)(1) of the Code of Professional Responsibility (an attorney should not state any matter that is not supported by admissible evidence). Assuming that the prosecution possessed the testimony of Shawn Butler that appellant confessed to the shooting, the prosecutor failed to proffer this rebuttal evidence. As such, the prosecutor's questioning influenced the jury in reaching a guilty verdict. State v. Sage (Nov. 3, 1983), Franklin App. No. 82AP-983, unreported.
While this court is mindful that counsel should be afforded wide latitude on cross-examination, there are limits. Evid.R. 611; State v. Garfield (1986), 34 Ohio App.3d 300, 303. We find that the prosecutor's line of questioning insinuated that appellant confessed to his cousin, Shawn Butler, that he killed Terry. It was clear through the testimony presented by Detective Phillip Paley that the detective spoke with Shawn Butler on more than one occasion. (Vol. IV, Tr. 71.) Therefore, the jury knew that Shawn spoke to the detective about the homicide. The implication arises that Shawn Butler could have revealed to the detective that appellant confessed to killing Terry. Therefore, it was improper to put before the jury evidence suggesting that appellant confessed to Shawn, when either there existed no factual predicate for that information and/or no testimony of such confession was put into evidence. State v. Daugherty (1987), 41 Ohio App.3d 91. See, also, State v. Evans (July 27, 2001), Montgomery App. No. 18512, unreported (question asked by the prosecutor was prejudicial and grounds for reversal, where prosecutor had no good-faith basis to ask the question).
After a review of the entire record, we find that the cross-examination of appellant violated his right to a fair trial. "The conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial." State v. Papp (1978), 64 Ohio App.2d 203, 211. Furthermore, "[i]t must be clear beyond a reasonable doubt that absent the conduct of the prosecution, the jury would have found the defendant guilty." State v. Vrona (1988),47 Ohio App.3d 145, 154, citing State v. Maurer (1984), 15 Ohio St.3d 239,266-268. We are not convinced that, absent the conduct of the prosecution, the jury would still have found defendant guilty. The evidence against appellant was not so overwhelming that the prosecution's misconduct paled by comparison. The evidence presented at trial was largely circumstantial and conflicted in various respects. We, therefore, conclude that the prosecutor's misconduct was obvious on the record, improper and prejudicial, thereby affecting appellant's substantial right and depriving him of his right to a fair trial.
Furthermore, in finding prejudicial error, we do not find it necessary to discuss the remaining issue of appellant's alleged gang involvement. As such, appellant's first assignment of error is well-taken and, under such circumstances, a reversal for a new trial is mandated.
In his second assignment of error, appellant contends that the evidence presented at trial was insufficient to sustain the conviction, and that the conviction was against the manifest weight of the evidence.
Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict. Id. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, syllabus paragraph two, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Jenks, at 273. If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for the defendant. See Thompkins, at 387.
Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence. Thompkins, at 387. In so doing, the court of appeals, sits as a "`thirteenth juror'" and, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. (quoting State v. Martin [1983], 20 Ohio App.3d 172, 175); see, also, Columbus v. Henry (1995), 105 Ohio App.3d 545, 547-548. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, at 387.
As this court has previously stated, "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, see [State v.] DeHass [(1967), 10 Ohio St.2d 230], such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236, unreported, at 2058. It was within the province of the trial court to make the credibility decisions in this case. See State v. Lakes (1964), 120 Ohio App. 213, 217. ("It is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness.")
Given our disposition of the first assignment of error, requiring a remand for a new trial, we will not address appellant's manifest weight of the evidence argument under his second assignment of error, as this issue is rendered moot. However, we will review appellant's sufficiency of the evidence claim in his second assignment of error, specifically because a "retrial is barred if [this court's] reversal was based upon a finding that the evidence was legally insufficient to support the conviction." Thompkins, at 387. When reviewing appellant's claim that the trial court's judgment is not supported by the evidence, we must review the record to determine if there was sufficient evidence which, if believed by the jury, would support a determination that appellant was guilty beyond a reasonable doubt, viewing such evidence in a light most favorable to the state. Jenks, supra.
In the present case, Willie testified that he observed a man wearing a dark denim outfit shooting inside the apartment at his brother. Willie further testified that Krishauna told him that appellant was wearing a dark denim outfit the night of the shooting. Erica testified that, as she ran outside, she saw appellant with a gun in his hand shooting in the direction of the front door to the building. Erica testified that, when she heard shots fired, she turned around and saw Terry fall to the ground. Erica stated that it was only she and appellant who were close enough to Terry when he was shot. Erica testified that it had to have been appellant who shot Terry, because she did not have a gun.
In reviewing the sufficiency of this evidence, we construed the evidence in a light most strongly in favor of the state and did not decide any "evidentiary conflicts in the defendant's favor nor substitute its assessment of the credibility of the witnesses for that of the trier of fact." State v. Millow (June 15, 2001), Hamilton App. No. C-000524, unreported. Our review of the record reveals that the testimony of the witnesses, if believed, was sufficient evidence and should have gone to the jury. See State v. Willard (2001), 144 Ohio App.3d 767 (prosecutor's improper comments at closing argument warranted a reversal, but evidence adduced at trial was sufficient to support appellant's convictions). As such, appellant's portion of his second assignment of error challenging sufficiency of the evidence is overruled. Accordingly, appellant's second assignment of error is overruled in part and moot in part.
In light of our disposition of appellant's first assignment of error, it is unnecessary for this court to address his third assignment of error, which alleges that the trial court failed to instruct the jury on the law of "justifiable homicide." Accordingly, appellant's third assignment of error is not well-taken and is overruled.
For the foregoing reasons, appellant's first assignment of error is sustained, the second assignment of error is overruled in part and rendered moot in part, and the third assignment of error is overruled. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part and this matter is remanded for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part, reversed in part and remanded for a new trial.
BRYANT and PETREE, JJ., concur.