JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Ronald Lutz, appeals his conviction and sentence following a jury trial. Defendant was convicted of twenty-five counts stemming from his attempt, along with two other men, to acquire three Cadillacs from DeLorean Cadillac. Instead of tendering cash, a bank check, or other standard financing option, defendant presented Mark DeLorean with a "documentary draft" which he claimed was payable from the account of the United States Department of Transportation. Believing that the draft was bogus and having been "burned" by a similar draft in the past, DeLorean notified the police. Mark DeLorean had worked with Detective Favre at the Lakewood Police Department the previous time he had been presented with one of these drafts, so he faxed the draft to Favre. Favre and five other detectives, all in plain clothes, immediately went to the dealership.
 {¶ 2} Mark DeLorean introduced Favre, who was wearing a recording device, to defendant and his companions as Ed Clark, who is familiar with the financing he was engaged in. Defendant told Favre, as he had told Mark DeLorean, to call Norman Mineta, Secretary of the Department of Transportation, for an explanation of defendant's authorization to access these funds. No one called the 800 number that day which defendant provided for contacting the Department of Treasury.
 {¶ 3} After this discussion concerning the financing, Favre and the other detectives arrested the men. Defendant was arraigned in Lakewood Municipal Court by Judge Patrick Carroll. Bond was set at $500,000[1] and the case was bound over to the grand jury, which indicted him in Case No. 403228 on charges of forgery in violation of R.C. 2913.31; uttering in violation of R.C. 2913.31; attempted theft in violation of R.C. 2923.02 and 2913.02; three counts of possession of criminal tools in violation of R.C. 2923.24; passing bad checks in violation of R.C. 2913.11; extortion in violation of R.C. 2905.11; intimidation in violation of R.C. 2921.04; and retaliation in violation of R.C. 2921.05. Defendant was transferred to the Cuyahoga County Jail to await posting of bond or trial.
 {¶ 4} During the time defendant was in the county jail, his cohorts were released on bond. The men out on bond filed "involuntary bankruptcy" proceedings against Judge Carroll and Mark DeLorean in Bankruptcy Court for Northern Ohio. Defendant's name was signed to these pleadings, and he was named as a creditor against both the judge and Mark DeLorean. When detectives from Lakewood went to the county jail to interview defendant on the day the bankruptcy filings were made, defendant not only told the detectives that the filings had been made, but he also told them the case numbers, that he had authorized the filings, and that his signature was on them. After Judge Carroll and Mark DeLorean hired counsel to represent them, the bankruptcy court, in response to motions filed by counsel, dismissed the cases as being without merit. Unfortunately for the judge and Mark DeLorean, however, the credit report companies had already received notice of the bankruptcy filings. Judge Carroll began receiving mailings from credit card companies soliciting his business following his supposed bankruptcy. More seriously, however, was the judge's requirement that he notify the Supreme Court of Ohio of the filing and its lack of validity. The Supreme Court had to conduct an inquiry to determine the judge's financial status. The judge also had to notify his mortgage holder and other creditors that the filings were not valid.
 {¶ 5} The ramifications of the fraudulent bankruptcy filings were more serious for Mark DeLorean and DeLorean Cadillac. Mark DeLorean testified that business at his dealership dropped more than 30% following the negative publicity surrounding the filings. He had to assure customers that they would receive their cars and the services they contracted for. Additionally, his competitors capitalized on the supposed bankruptcy by informing their customers that Mark DeLorean and DeLorean Cadillac were no longer solvent. Mark DeLorean also had to notify his personal creditors of the invalid filings. Finally, Mark DeLorean and DeLorean Cadillac also incurred significant legal fees defending the bankruptcy case.
 {¶ 6} Defendant and his cohorts also attempted to file involuntary bankruptcy against Detectives Lissner, Sacco, and Favre. Because the filings were made under the case number of the petition against DeLorean, the filings did not result in suits against the detectives.
 {¶ 7} Meanwhile, Jim Rivers, a California man acquainted with defendant, contacted defendant, asked whether he was being held against his will, and offered assistance in getting him out of jail. Defendant accepted this offer, and shortly thereafter, each detective involved in the case, the arraigning judge, the presiding judge, and the clerk of courts received a summons from the "Tacit-Law Court" in Minnesota, ordering them to forward a copy of their wills to the court. When none of these people responded to the summons, they received a default judgment entry from this court, and then a "cease and desist" order. Although the court was listed as being in Minnesota, the return address on all the correspondence was that of Jim Rivers in California.
 {¶ 8} In addition to the above listed charges resulting from the attempted acquisition of the car with the "documentary draft," defendant was indicted for engaging in a pattern of corrupt activity in violation of R.C. 2923.32, extortion in violation of R.C. 2905.11 (five counts), retaliation in violation of R.C. 2921.05 (six counts), and intimidation (twelve counts). These charges arose from the activities of defendant's co-defendants and Jim Rivers of the "Tacit-law court."
 {¶ 9} While he was in jail, defendant filed a hand-written letter and "documentary draft" for $500,000 which he sent to Clerk of Courts Gerald Fuerst in an attempt to post bond. The clerk forwarded these papers to the county sheriff, who assigned the case to Detective Cleland. When the clerk did not respond to defendant's bail attempts, defendant sent a pointed letter to the clerk stating that failure to respond as requested would result in the "extraordinary remedy" of defendant obtaining "treble damages in an involuntary Chapter 7 proceeding." State's Ex. 67.
 {¶ 10} In response to these communications, the grand jury further indicted defendant on four counts of forgery in violation of R.C. 2913.31; two counts of uttering in violation of R.C. 2913.31; one count of complicity to commit uttering in violation of R.C. 2923.01/2913.31; one count of intimidation in violation of R.C. 2921.04; and three counts of sham legal process in violation of R.C. 2921.52.
 {¶ 11} In his testimony at trial defendant explained his actions by extensively discussing beliefs concerning the government and economic system. Defendant subscribes to a political-economic theory called Redemptionism. This theory claims that the United States government has been in bankruptcy and receivership since 1933, when the government went off the gold standard.
 {¶ 12} The Redemptionists claim that by a birth certificate, the government created "strawmen" out of its citizens. A person's name spelled in "English," that is with initial capital letters and small letters, represents the "real person," that is, the flesh and blood person. Whenever a person's name is written in total capitals, however, as it is on a birth certificate, the Redemptionists believe that only the "strawman" is referenced, and the flesh and blood person is not involved.
 {¶ 13} The "strawman" is a creation of the government and a legal fiction to extract money for funding the government. By filing a UCC-1 financing statement, the flesh and blood person can make a claim against the assets obtained by the government from the "strawman". The flesh and blood person Ronald Lutz, therefore, filed a UCC-1 financing statement against the assets earned by the "strawman" RONALD LUTZ and held by the government. By filing this statement, the Redemptionists believe, the flesh and blood person can draw against the funds earned by the "strawman".[2]
 {¶ 14} Those funds were supposedly held by the then Secretary of the Department of Transportation, Norman Mineta. To draw these funds, the Redemptionists produce a documentary draft for the amount of whatever purchase they want to make, attach a copy of their birth certificate, UCC-1 financing statement, and other documents, present it to the seller, refer the seller to Mineta, and order that the funds be paid by the Department of Transportation.
 {¶ 15} The Redemptionists claim that when the country went into bankruptcy, maritime law became the law of the land. The only laws in force are the UCC, and every interaction between persons is financial. They do not recognize criminal laws: all criminal charges are financial in nature. They therefore claim that the bankruptcy filings were necessary because Judge Carroll and DeLorean violated defendant's economic rights, the judge by incarcerating him and DeLorean by failing to "honor the contract" to transfer the Cadillacs to him and his co-defendants.
 {¶ 16} This case began in late January 2001, when several local men paid defendant to fly to Cleveland to teach them how to transact business in this fashion and, specifically, to help them acquire Cadillacs from DeLorean. Defendant is the founder of the "Diogenes Historical Society," which espouses Redemptionist theory, and runs a web site devoted to the topic. He also gives seminars, writes and sells books and video tapes, and researches the law on Redemptionism. He refers to the men who brought him to Cleveland as "students" and to himself as "Professor Diogenes."
 {¶ 17} At his trial, defendant was well represented by counsel, but he insisted, against his counsel's advice, on testifying to present his beliefs to the jury. Defendant testified to a work history that includes, despite his lack of accounting background, writing several accounting programs for computers; being manager of the auditing division at Coopers Lybrand; handling all the legal and computer problems for Long Beach Mortgage Company despite his lack of legal background; and selling to ITT software he had written. Defendant argued that, even if the document he presented to DeLorean had not been valid, DeLorean only had to walk away from the deal, rather than call the police. Because the deal was never completed, he continues, he could not have committed any crime. No one tried to negotiate the draft at a bank or the Department of Transportation. Further, because this was purely a financial interaction, he claims, only the laws of the UCC apply to it.
 {¶ 18} Defendant was the only witness in his defense, and after hearing some of his testimony, the court decided to limit the time he would be allowed to testify. Pointing out the length of the trial, the court stated, "I've tried capital murder cases where the defendant hasn't taken more than an hour to testify, so I think that's very reasonable." Tr. at 1537. Defendant duly objected, and the court limited defendant's direct testimony to just over one day and also limited the cross-examination, the redirect, and recross.
 {¶ 19} At the trial, the state produced a number of witnesses, including a man who calls himself the "Militia Watchdog," Mark Pitcavage. Pitcavage considers himself to be an expert on right-wing groups, and he classifies Redemptionism as one of those. Despite defendant's objection, the court permitted Pitcavage to testify at length concerning Redemptionism and a number of other apparently unrelated right-wing groups and theories, including the groups he said were responsible for Waco, Ruby Ridge, and the Montana Militiamen.
 {¶ 20} In addition to Pitcavage, the state presented testimony from the victims of defendant's bankruptcy filings as well as the victims of the "Tacit-law Court" filings. After the prosecution nolled several counts, the remaining charges went to the jury, which found defendant guilty of all the charges. Defense counsel's request to be relieved of the case following the verdict was granted. Defendant was sentenced to a prison term on all the counts, but the court ran the sentences for each case concurrent with the other sentences in that case. The court also ordered the concurrent sentences in each of the three separate cases to run consecutively for a total of seventeen years. Defendant timely appealed.
 {¶ 21} For the sake of clarity, we will address the assignments of error out of order. For his seventh assignment of error, defendant states:
 {¶ 22} "VII. Appellant's conviction should be reversed in that there is insufficient evidence to sustain the verdict and the verdict is against the manifest weight of the evidence."
 {¶ 23} At the outset, we note that most of defendant's assignments of error address evidentiary issues. Defendant first challenges whether (1) the state presented enough evidence, if believed, to support a conviction, and (2) whether defendant's conviction is against the manifest weight of that evidence. To address this assignment of error, we will consider only the evidence which is not in dispute or is properly in evidence.
 {¶ 24} Defendant fails in his brief to differentiate between sufficiency of the evidence and the manifest weight of the evidence. As the Supreme Court of Ohio explained in State v. Thompkins (1997),78 Ohio St.3d 380:
 {¶ 25} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487, 55 Ohio Op. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"(Emphasis added.) Black's, supra, at 1594.
 {¶ 26} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs,457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v.Martin (1983), 20 Ohio App.3d 172, 175, 20 Ohio B. Rep. 215, 219,485 N.E.2d 717, 720-721 (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')."
 {¶ 27} Determining the sufficiency of the evidence, on the other hand, requires a different test, which is explained in State v. Martin
(1983), 20 Ohio App.3d 172:
 {¶ 28} "In considering the claim that the conviction was not supported by sufficient probative evidence, the test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence."
 {¶ 29} In Case No. 403228, defendant was convicted of forgery, uttering, attempted theft, extortion, intimidation, and retaliation.
 {¶ 30} Forgery and uttering are violations of R.C. 2913.31, which states in pertinent part:
 {¶ 31} "(A) No person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall do any of the following:
 {¶ 32} "* * *
 {¶ 33} "(2) Forge any writing so that it purports to be genuine when it actually is spurious * * *;
 {¶ 34} "(3) Utter, or possess with purpose to utter, any writing that the person knows to have been forged."
 {¶ 35} The first necessary element of the crime is an intent to defraud, which is defined in R.C. 2913.01(B): "`Defraud' means to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." In order to defraud someone, therefore, the defendant must have used deception. Deception is also defined in R.C. 2913.01(A): "`Deception' meansknowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a falseimpression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." (Emphasis added.)
 {¶ 36} Defendant does not dispute that the documentary draft entered into evidence is the draft he presented to DeLorean or that he attempted to use that draft in exchange for a Cadillac. Although defendant claimed he believed that the draft was negotiable against the Department of Transportation, he also admits that the draft is not negotiable in the ordinary banking system.
 {¶ 37} In presenting this draft in payment for the purchase of a car, he misrepresented its actual value as to its negotiability. No matter what defendant believed as to the validity of government action, defendant had no objective reason to believe that the draft was negotiable. The draft was created, therefore, to defraud DeLorean.
 {¶ 38} Further, although the burden of proof is on the state, when a fact is put into issue, the defendant must present evidence to rebut the evidence against him. In the case at bar, defendant presented no evidence to support his allegation that the Department of Transportation would pay DeLorean Cadillac for a car purchased by defendant. Defendant admitted that the draft would not clear in the United States banking system. For the crime of forgery, the jury had sufficient evidence from the draft itself and the testimony of defendant to determine that the draft was false insofar as it was not a negotiable instrument. Because defendant admitted that he intended to use the draft to pay for the car, the jury could determine that the intent to defraud existed. We find sufficient evidence, therefore, to support the conviction of forgery.
 {¶ 39} To satisfy the elements of uttering, the statute requires a purpose to defraud by issuing, publishing, transferring, using or putting or sending into circulation, delivering, or displaying a forgery. We have already found the purpose to defraud. Defendant freely admitted transferring the draft, which is a forgery, to DeLorean. This admission provided the second element, that is, possessing a forged writing. The draft, therefore, along with the testimony of defendant, is also sufficient evidence to support a conviction for forgery and uttering.
 {¶ 40} Defendant was also convicted of attempted theft because he tried to obtain a car with a fraudulent draft. He argues that because he never actually obtained the title or keys to the car and because the papers were never signed, he cannot be convicted of this crime.
 {¶ 41} Defendant fails to distinguish between theft and attempted theft. "Theft" is defined in R.C. 2913.02, which states in pertinent part: "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: * * * (3) By deception; (4) By threat; (5) By intimidation. (B)(1) Whoever violates this section is guilty of theft." Acquiring the Cadillac in exchange for the draft would have constituted theft.
 {¶ 42} "Attempt" is defined in R.C. 2923.02, which states in pertinent part: "(A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense. (B) It is no defense to a charge under this section that, in retrospect, commission of the offense that was the object of the attempt was either factually or legally impossible under the attendant circumstances, if that offense could have been committed had the attendant circumstances been as the actor believed them to be. (C) No person who is convicted of committing a specific offense, of complicity in the commission of an offense, or of conspiracy to commit an offense shall be convicted of an attempt to commit the same offense in violation of this section. * * * (E) Whoever violates this section is guilty of an attempt to commit an offense. * * *"
 {¶ 43} Defendant admitted that he had every intention of acquiring a Cadillac with his documentary draft. Defendant further admitted that he would have taken the Cadillac if the deal had been consummated. We already determined that defendant used deception in his tendering of the documentary draft. He knew that the draft was not negotiable, yet he presented it with the intent that DeLorean would accept it for payment. The undisputed evidence, therefore, supports a conviction of attempted theft.
 {¶ 44} Defendant was also convicted of extortion for the fraudulent bankruptcy filing against DeLorean Cadillac. The elements of the crime of extortion are set out in R.C. 2905.11: "(A) No person, with purpose to obtain any * * * valuable benefit or to induce another to do an unlawful act, shall do any of the following: * * * (4) Utter or threaten any calumny against any person; (5) Expose or threaten to expose any matter tending to subject any person to hatred, contempt, or ridicule, or to damage any person's personal or business repute, or to impair any person's credit. (B) Whoever violates this section is guilty of extortion, a felony of the third degree. (C) As used in this section, `threat' includes a direct threat and a threat by innuendo."
 {¶ 45} In the case at bar, defendant admitted to Det. Sacco and Det. Lissner that he had authorized the filings of bankruptcy against DeLorean. Although defendant testified differently, the testimony of both detectives clearly supports a finding that defendant knew and authorized the threatening letter that had been sent to DeLorean. The record contains sufficient evidence to support this finding.
 {¶ 46} Defendant's next conviction is for intimidation against DeLorean. Intimidation is defined in R.C. 2921.04: "(A) No person shall knowingly attempt to intimidate or hinder the victim of a crime in the filing or prosecution of criminal charges or a witness involved in a criminal action or proceeding in the discharge of the duties of the witness. (B) No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a criminal action or proceeding in the discharge of the duties of the attorney or witness. * * * (D) Whoever violates this section is guilty of intimidation of an attorney, victim, or witness in a criminal case. A violation of division (A) of this section is a misdemeanor of the first degree. A violation of division (B) of this section is a felony of the third degree."
 {¶ 47} Defendant admitted writing the letter to DeLorean threatening to file involuntary bankruptcy against him. The letter states:
 {¶ 48} "This NOTICE is written pursuant to our original credit transaction under Title 12 section 95(a),(b) on Thursday February 1, 2001.
 {¶ 49} "Since you have failed to release the property to use within 72 hours T+3 [sic] pursuant to Title 15 section 1601-1693 (TheTruth-in-Lending Act), You [sic] are therefore holding contraband under title 50 section 5 of the `Trading With the Enemy Act' in violation of our original agreement and transaction. If you fail to release the property within 24 hours, I will file a Chapter 7 section 303 action against you for involuntary Bankruptcy to liquidate the contraband and your assets to pay the debt.
 {¶ 50} "If all men in custody are not immediately released, articles will be published on the Internet that DeLorean Cadillac, 
Municipal Judge Patrick Carroll of Lakewood, Ohio, are using the contraband to launder drug money.
 {¶ 51} "A copy will be sent to: BATF (IRS), U.S. Attorney John Ashcroft, `THE ALIEN PROPERTY CUSTODIAN,' the Internet, and the Department of Motor Vehicles.
 {¶ 52} "We will also contact and name all your advertisers in the Bankruptcy petition, since they are confederates of yours, by selling automobiles that you cannot pass title to. Please advise us to how, when, and where the property will be released to us. You have 24 hours to comply with our demand. (signed) Ronald Lutz * * *."
 {¶ 53} Although defendant denied that the letter was intended as a threat, an objective reading of it supports the conclusion that it is indeed a threat. The letter clearly threatened to publish that DeLorean Cadillac was using "the contraband to launder drug money." He threatened to communicate this claim on the Internet, with his peers, and with the government. In other words, defendant articulated his intent to make a public announcement that would surely injure DeLorean's Cadillac's reputation. Defendant's purpose was to force DeLorean into effecting the release of all the men in custody. The only way DeLorean could have effected the release of the men would have been to drop the charges. Thus this threat was made to intimidate DeLorean so he would not continue to press charges against defendant. We conclude, therefore, the state presented sufficient evidence to support a conviction for intimidation.
 {¶ 54} The final conviction in Case No. 403228 is for retaliation against DeLorean. "Retaliation" is defined in R.C. 2921.05: "(A) No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or witness who was involved in a civil or criminal action or proceeding because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness. (B) No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against the victim of a crime because the victim filed or prosecuted criminal charges. (C) Whoever violates this section is guilty of retaliation, a felony of the third degree."
 {¶ 55} We have already established that the letter defendant sent to Mark DeLorean was a threat, made to intimidate him into dropping criminal charges. Defendant himself testified that he considered the filing his only "remedy" to DeLorean Cadillac and Mark DeLorean's actions. Those charges existed only because DeLorean, both personally and as a corporation, was the victim who filed them. Those charges, therefore, are the cause of the threatened action. As such, the threats contained in the letters constitute retaliation under R.C. 2921.05(B). The actions threatened were clearly in response to both Mark DeLorean's refusal to allow his company DeLorean Cadillac to transfer the cars to defendant in exchange for the documentary drafts but also his refusal to withdraw his complaint with the police which resulted in their subsequent criminal prosecution of defendant. The state provided sufficient evidence, therefore, to support a conviction for the crime of retaliation for sending a threatening letter to DeLorean.
 {¶ 56} In Case No. 404605, defendant was convicted of the following charges: engaging in a pattern of corrupt activity, retaliation (seven counts), intimidation (eight counts), and extortion. Indictment, Case 404605.
 {¶ 57} The first conviction in this case is for engaging in a pattern of corrupt activity for participating with the other defendants in attempting to pay for the cars with the documentary drafts against the Department of Transportation, which activity comprises attempted theft, forgery and uttering; filing the bankruptcy cases against DeLorean and Judge Carroll; intimidating, extorting and retaliating against DeLorean for prosecuting the case.
 {¶ 58} The definition of engaging in a pattern of corrupt activity is found in R.C. 2923.32, which states in pertinent part: "(A)(1) Noperson employed by, or associated with, any enterprise shall conduct orparticipate in, directly or indirectly, the affairs of the enterprisethrough a pattern of corrupt activity or the collection of an unlawfuldebt. (2) No person, through a pattern of corrupt activity or the collection of an unlawful debt, shall acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property. * * * (B)(1) Whoever violates this section is guilty of engaging in a pattern of corrupt activity." Emphasis added.
 {¶ 59} Because we have already found that the state carried its burden of proof concerning the attempted theft, forgery, and uttering, we need to determine only whether defendant participated in these crimes as part of any enterprise as part of a pattern. "`Enterprise' includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in factalthough not a legal entity. `Enterprise' includes illicit as well as licit enterprises." (Emphasis added.) R.C. 2923.31(C).
 {¶ 60} Defendant testified that his co-defendants paid for his plane ticket to Cleveland so he could help them use the documentary drafts to purchase the Cadillacs. He referred to his co-defendants as "students" and to himself as their "professor." Defendant's own testimony provided enough evidence that he was sufficiently associated with these men to prove the existence of an enterprise.
 {¶ 61} The second element is that the men acted in concert in a "pattern of corrupt activity": "Pattern of corrupt activity" means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event. R.C. 2923.31(E). The incidents of corrupt activity consisted of retaliation by filing bankruptcies against DeLorean and Judge Carroll. Although not the same event as the attempted theft which occurred when they tried to buy the cars, these incidents are directly related to the attempted theft of the cars and the subsequent arrest, jailing, and prosecution associated with this crime. Defendant participated in these activities with the other defendants as a part of the same enterprise as the attempted theft. The use of the forged documents, the attempted theft, and the subsequent bankruptcy filings are related to each other, but are not the same activity. These separate activities of the defendant with his co-defendants qualify as a pattern of corrupt activity. The state provided sufficient evidence to support this conviction.
 {¶ 62} The next two convictions in this case are for retaliation against Mark DeLorean and against DeLorean Cadillac by defendant filing the bankruptcy proceedings. The bankruptcy court not only found that the bankruptcy filings were without merit, but also awarded sanctions to DeLorean against defendants and specifically found that Lutz's letter to the bankruptcy court "showed malicious intent * * *." In re: Cadillac byDeLorean (265 B.R. 574, 579, fn. 2. Defendant willingly admitted on cross-examination that he had written and sent the letter to the bankruptcy court.)
 {¶ 63} By categorizing the bankruptcy filings as "our Remedy," defendant admits not only that the filings were in response to charges but also that the response is that of a group. He states: "My understanding is that they have added 42 more counts of Threat, Intimidation and Retaliation because we have sought out our proper remedy to their other fictitious claims * * *." State's Ex. 60. Clearly the bankruptcy filings were in retaliation for the continued prosecution of the underlying case of forgery, uttering, and attempted theft. The state, therefore, provided sufficient evidence of retaliation against Mark DeLorean and DeLorean Cadillac. Defendant, along with the rest of the group, worked together in the attempt to defraud, the uttering, the retaliation, and the filing of false bankruptcy filings. The state supplied adequate evidence to support the finding that the retaliation was part of a pattern of corrupt activity.
 {¶ 64} The next two convictions in this case are for intimidation: against DeLorean Cadillac for intimidation and against Mark DeLorean for prosecuting the charges. As noted above, the elements of intimidation are, first, a threat to person or property, and second, the purpose of the threat being an attempt to hinder the victim of a crime from prosecuting his case against the defendant. Defendant's letter to the bankruptcy court provides more than enough evidence to support a finding that the filing constituted a threat to make him drop the prosecution and was made in part to intimidate DeLorean. Combined with the uttering, attempted theft, retaliation and fraudulent bankruptcy filings, defendant's and the group's activities of intimidation qualify as a pattern of corrupt activity. They first attempted to defraud, then retaliated and intimidated when the party they were attempting to defraud sought legal recourse.
 {¶ 65} Intimidation is also the basis for the next two convictions. The charge alleged that defendant and his cohorts filed bankruptcy against DeLorean and his dealership in order to intimidate them into dropping the charges against them. As we noted above, the elements of intimidation are, first, attempting to intimidate or hinder a victim of a crime and, second, by that intimidation attempting to interfere with the prosecution of criminal charges. Again, the letter to the bankruptcy court is sufficient evidence to support a conviction for intimidation. Because the intimidation was in concert with the retaliation, the fraudulent bankruptcies, the threats of slander on the Internet, and the attempted theft of the cars, it was part of a pattern of corrupt activity.
 {¶ 66} The next conviction is for extortion against Judge Carroll. As noted above, the elements of extortion are, first, the intent to gain a valuable benefit, and second, exposing another to damage to his reputation or credit in order to obtain that benefit. In the letter addressing the bankruptcy filing, defendant states that the filing is his "remedy" against the judge. The bankruptcy filing against Judge Carroll first demands "Release of Principal Creditor Ronald Lutz, who has been kidnaped for 15 days." State's Ex. 48. It also claims that the judge owes defendant a total of $456,000 and requests liquidation of all the judge's assets. The jury could rationally conclude that the filing was intended to motivate the illegal release of the defendant. Again, this extortion is part of the group's pattern of corrupt activity: they were jailed for their attempted theft of the cars and then proceeded to attempt to free themselves through intimidation, retaliation, filing the fraudulent bankruptcies, and this extortion.
 {¶ 67} The remaining convictions are for retaliation and intimidation against Judge Carroll, Det. Lissner, Det. Favre, and Det. Sacco. Defendant and his cohorts filed or attempted to file bankruptcy against each of these persons after they had arrested, interrogated, or arraigned him. As we have already seen, defendant considered these filings to be his "remedy" to his arrest and prosecution. The only contact these persons had with defendant was in their professional capacity insofar as they arrested, interrogated, or arraigned him. Defendant's only plausible motive in filing bankruptcy against each individually must have been to retaliate for these actions or to intimidate or motivate them to drop the prosecution and free the defendant. Defendant denies, however, he knew or participated in the filings against the detectives or the judge. But he also denied any connection with the other bankruptcy filings although there is overwhelming evidence that he was involved in them. The jury could reasonably believe, therefore, that he was also involved in these. Because all the other activities, including the retaliation, intimidation, and threats were part of a pattern of corrupt activity, these attempted and completed bankruptcy charges are part of the pattern of corrupt activity already established.
 {¶ 68} The state provided sufficient evidence to support a conviction on all the charges in this case.
 {¶ 69} The final case of the three consolidated cases on appeal is Case No. 405339, which addresses the correspondence with the Clerk of Courts, Gerald Fuerst. In this case, defendant was convicted of
 {¶ 70} forgery, uttering and intimidation.
 {¶ 71} As previously discussed, forgery requires a writing which purports to be genuine but is in fact spurious. The draft defendant admits creating and sending to the clerk contains no account number and no routing number. Rather, it is hand-written and states that it is payable through RONALD LUTZ and lists his California address. Because it lacks any backing other than defendant's name, it is clearly no more than a promise to pay the amount himself. It does not even contain defendant's usual instructions for presenting the draft to the Department of Transportation.
 {¶ 72} Defendant created this writing, as he testified, with the intent that it be accepted as bail in his case. He tendered it in payment for bail, as though it had a value, $500,000, which it does not have. The draft therefore is a deception, presented to defraud the clerk. The jury, therefore, had sufficient evidence to convict defendant of forgery for this draft. The next charge in this case is uttering, which, as previously noted, requires a purpose to defraud. We have already found that the draft sent to Fuerst was sent with the intent to defraud, that is, to use it to get out of jail for no value in exchange. Because defendant admitted he made and sent this draft for this purpose, the conviction for uttering is supported by sufficient evidence.
 {¶ 73} Defendant's final conviction in this case is for intimidation of Fuerst. After Fuerst failed to respond to defendant's attempted bail, defendant sent a letter stating that if Fuerst did not honor the draft, defendant would file involuntary bankruptcy against him.
 {¶ 74} The letter is clearly a threat: it expressly states that failure to release defendant on bond would result in the filing of bankruptcy. Defendant admitted under oath that he wrote and sent the letter. Tr. at 1899. On its face, the letter contains the elements of the crime of intimidation: it was intended to influence Fuerst into releasing defendant without proper bond. Sufficient evidence exists, therefore, to support the conviction of intimidation against Fuerst.
 {¶ 75} Defendant also claims that his conviction is against the manifest weight of the evidence. As the court stated in Martin:
 {¶ 76} "In considering the claim that the conviction was against the manifest weight of the evidence, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
 {¶ 77} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id., paragraph 3, syllabus.
 {¶ 78} After reviewing the entire transcript and all the evidence, we find that the evidence weighs heavily in favor of conviction. The letters, along with the testimony of the detectives and defendant, create more than an inference that defendant is guilty. After the case is stripped to its bare essentials, it is clear that defendant presented home-made but realistic looking drafts drawn against a nonexistent government fund and tried to use them to buy three Cadillacs. Further, defendant's own writings, along with his statements to the detectives concerning the bankruptcy filings, weigh heavily in favor of the findings that he intended to intimidate and retaliate against DeLorean and his business, Judge Carroll, the detectives, and Clerk of Courts Gerald Fuerst. Finally, defendant's own testimony that he came to Cleveland at the behest of the co-defendants for the purpose of buying the cars and his subsequent actions with the co-defendants weigh heavily in favor of the existence of a pattern of corrupt activity. We find that the weight of the evidence is strongly in favor of defendant's conviction.
 {¶ 79} Defendant also argues in this assignment of error that because the drafts presented to DeLorean were never negotiated and consequently never dishonored, they could not be considered "spurious." He also argues that the court failed to define "spurious" in its jury instructions.
 {¶ 80} First, we note that defendant failed to object to the jury instructions. "Ordinarily, the failure to timely object to a jury instruction violative of R.C. 2901.05(A) constitutes a waiver of any claim of error relative thereto. Crim. R. 30." State v. Long (1987),53 Ohio St.2d 91, syllabus paragraph 1. The issue is waived, therefore, absent plain error. "A jury instruction violative of R.C. 2901.05(A) does not constitute a plain error or defect under Crim. R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise." Id. paragraph 2.
 {¶ 81} The trial court's failure to define "spurious" in its jury instructions fails to reach the level of plain error because, first, there is no requirement that the court define this term. The court's jury instruction on this charge came directly from Ohio Jury Instructions. Further, the charge in the jury instructions uses the term "spurious" as equivalent to the term "false." OJI provides definitions of legal terms, such as "purpose," "motive," "affirmative defense," and "preponderance of the evidence." Defendant provided no indication of why the term "spurious," which is not a legal term but rather a word used for its ordinary meaning, would require the court to define it. Defendant, moreover, fails to show how the failure to define this word prejudiced the defendant. This argument is, therefore, without merit.
 {¶ 82} Defendant next argues that he cannot be guilty of attempted theft because the prosecution failed to prove his "purpose in the absence of the dishonor of the drafts." He claims that "[t]he jury was left to speculate on the culpable mental state element." Defendant's own testimony contradicts this claim, however. He stated that he intended to drive away with the Cadillac in exchange for the draft. Defendant having stated a purpose, the crime is attempted theft, because defendant's scheme failed.
 {¶ 83} Finally, defendant argues that the state failed to prove the existence of an "enterprise" necessary for a conviction of engaging in a pattern of corrupt activity, because prior to defendant's arrival in Cleveland there had been no connection between him and the co-defendants. Further, he argues, because the state failed to prove the forgery and uttering charges without the dishonoring of the draft, no corrupt activity existed and no pattern of corrupt activity existed. These arguments have previously been addressed and are without merit.
 {¶ 84} The trial court's conviction of defendant is not against the manifest weight of the evidence. Defendant's remaining assignments of error also lack merit.
 {¶ 85} For his first assignment of error, defendant states:
 {¶ 86} "I. The entire testimony of Mark Pitcavage was irrelevant, prejudicial, immaterial, incompetent, and inadmissible and constituted character assassination in violation of appellant's right to a fair trial."
 {¶ 87} Defendant argues that because he never had any dealings with Pitcavage, the alleged expert on right-wing groups and "Militia Watchdog," and because Pitcavage was never qualified as an expert he should not have been permitted to testify. He points out that Pitcavage testified concerning a number of right-wing groups, including those involved at Waco and Ruby Ridge. Because no evidence was presented that defendant had any association with violence, he argues that allowing this witness to lump him and the Redemptionists with these violent militia types unduly prejudiced the jury against him.
 {¶ 88} The qualification of an expert witness is governed by Evid.R. 702, which states in pertinent part: "A witness may testify as an expert if all the following apply: (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *."
 {¶ 89} The qualification of a non-expert witness is governed by Evid.R. 601, which defines the competency of a witness. We note that although Pitcavage was presented as an expert, the court never actually qualified him as one.[3] Nonetheless, if the admission of evidence, even if in error, does not change the ultimate outcome of the case, it is harmless error. Crim.R. 52(A) requires us to disregard "[a]ny error, defect, irregularity, or variance which does not affect substantial rights."
 {¶ 90} In the case at bar, we agree with defendant that Pitcavage's testimony was prejudicial and inadmissible. Nonetheless, even without this testimony, the evidence overwhelmingly supports defendant's conviction. Because the prejudicial testimony of Pitcavage did not affect the outcome of the case, its admission is harmless error. Accordingly, the first assignment of error is overruled.
 {¶ 91} For his second assignment of error, defendant states:
 {¶ 92} "II. The cumulative effect of ignoring the rules of evidence throughout appellant's trial denied appellant a fair trial."
 {¶ 93} Defendant alleges that multiple violations of the rules of evidence tainted the trial and thus denied him a fair trial. First, he argues that several fact witnesses gave opinion testimony concerning the exhibits, which testimony would have been appropriate coming only from an expert witness. The secret service agent, for example, stated that he knew of no way that the draft would be negotiable. He was careful, however, in his testimony to avoid saying that the draft was a forgery.
 {¶ 94} Defendant also objects to Detective Favre's testimony concerning the Redemptionist theory and its proponents, as well as his testimony stating that the documentary draft defendant presented to DeLorean was a forgery and fraudulent. Defendant argues that it is for the jury, not a witness, to draw this conclusion. Favre made these statements, however, to explain his reasons for arresting defendant. Without this belief, Favre would have had no basis to arrest defendant.
 {¶ 95} "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evidence Rule 704. However, "[i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." Evid.R. 701. To explain his motive for arresting defendant, the detective stated that he was convinced that the drafts were forgeries, just as a policeman would testify that he believed that a substance was an illegal narcotic or that an item in the possession of a suspect was stolen property.
 {¶ 96} Nonetheless, admissible evidence must be excluded if its admission would be too prejudicial to the defendant. Evidence Rule 403(A) states: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Defendant argues that the detective's statement that the documents were forgeries should have been excluded because it was unfairly prejudicial.
 {¶ 97} Without deciding on the statements' admissibility, we find that their admission constitutes harmless error. Harmless error is defined as "[a]ny error, defect, irregularity or variance which does not affect substantial rights * * *." Crim.R. 52(A). When the error does not affect a substantial right, it "shall be disregarded." Id.
 {¶ 98} "The admission or exclusion of evidence lies in the trial court's sound discretion. State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140." State v. Bentley
(Oct. 30, 2000), Stark App. No. 2000CA00147.
 {¶ 99} We find that the admission of this testimony was, at worst, harmless error. "Prejudicial evidence is harmless beyond a reasonable doubt, where the remaining evidence standing alone constitutes overwhelming proof of a defendant's guilt. See State v. Williams (1983),6 Ohio St.3d 281, 452 N.E.2d 1323." State v. Ross (May 20, 1993), Cuyahoga App. No. 62115. In the case at bar, the testimony of DeLorean and the defendant himself provided overwhelming evidence to support the jury's finding that the documents were forgeries. Defendant admitted that they were not negotiable through the ordinary banking system. Given this admission, the detective's statement that he recognized the documents as a forgery was harmless error.
 {¶ 100} Because defendant's guilt was overwhelming even if determined only by his own testimony, "we find that substantial justice has been done and that the trier of fact would have reached the same decision had this error not occurred." Kromenacker v. Blystone (1987), Ohio App.3d 126, 130. It is clear beyond a reasonable doubt that without the detectives' testimony, defendant still would have been convicted.
 {¶ 101} On appeal defendant raises numerous other instances of improperly admitted testimony — statements that defense counsel did not object to below. Statements not objected to can be examined only under the plain error standard. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). A court will find plain error, however, only if "it can be said that but for the error, the outcome of the trial would clearly have been otherwise." State v. Nicholas (1993),66 Ohio St.3d 431, 436.
 {¶ 102} The following are statements which counsel did not object to below but now challenges: (1) Mark DeLorean's characterization of the defendant's attempt to buy a car with a sight draft as evil; (2) Detective Favre's discussion explaining the Redemptionist theory to the jury and his characterization of the theory as evil; (3) Detective Favre's characterization of a sight draft submitted to the State of Wisconsin as fraudulent; (4) Detective Favre's characterization as a threat defendant's notice to DeLorean that defendant would file bankruptcy against DeLorean; (5) Favre's statement that defendant constituted a flight risk; (6) Detective Lissner's statement that he felt defendant's bankruptcy filing against him was retaliatory; (7) the statement by a supervisor in the Clerk of Courts office that the draft submitted to the Clerk for bail was not a legitimate bank draft. Defendant claims that only a banking expert could testify to the draft's authenticity.
 {¶ 103} Defendant also challenges, for the first time on appeal, numerous statements in Detective Cleland's testimony: (9) the detective's statement that the focus of his work is a right-wing activity; (10) the detective's testimony about the UCC without his being qualified as an expert; (11) his explanation of the Redemptionist theory to the jury; (12) his testimony about another person who tried to use a sight draft to pay his taxes; (13) the detective's testimony about what the Tacit Law Court is; (14) the detective's statement informing the jury that the person who had tried to pay his taxes with a sight draft used the same counsel as defendant; (15) the detective giving his opinion that defendant was responsible for the Tacit Law documents; (16) Detective Sacco's statement that Detective Favre had told him the sight drafts defendant used at DeLorean Cadillac were spurious.
 {¶ 104} Although many of these statements constitute hearsay, none of them is such that the outcome of the trial would have been different. These statements, therefore, do not meet the plain error standard. As noted above, defendant's own testimony, along with testimony not challenged on appeal, overwhelmingly supports conviction.
 {¶ 105} Defendant also cites several other instances when his counsel did object to testimony and was overruled. Defendant reiterates his objection (1) to DeLorean's testimony concerning another person's previous attempt to buy a car with a sight draft; (2) to Detective Favre's statement that the people who tried to buy a car with a sight draft were subsequently convicted; (3) to the use of the unsworn testimony from the bankruptcy hearing transcript; (4) to the lack of foundation for a witness's statement that the drafts did not appear valid; (5) to a witness's opinion that written statements defendant had sent to DeLorean constituted a threat; (6) to another witness's statement that defendant's explanation of the sight drafts when he tried to use them at DeLorean's "made no sense," as well as to that witness's interpretation of various documents; and (7) to the state's rebuttal testimony in which Detective Lissner recounted a statement from an employee of the Treasury Department that the sight drafts are forgeries and are bogus.
 {¶ 106} Even if the court admitted all this testimony erroneously, however, "[a] reviewing court is not permitted to reverse a judgment of conviction `unless it shall affirmatively appear from the record that the accused was prejudiced thereby or was prevented from having a fair trial.'" Citation omitted. State v. Naples (1952),94 Ohio App. 33, paragraph five of the syllabus. R.C. 2945.83.
 {¶ 107} We first note with surprise how many times the prosecutor ignored the ordinary rules of evidence and find equally surprising that the defense did not object to more of the testimony. In any event, none of this evidence prevented defendant from having a fair trial. Because defendant's own testimony essentially sealed the verdict, the numerous examples of inadmissible hearsay do not violate the Naples test: that is, they do not affect a substantial right because the outcome of the trial would not have been different without them. Defendant's own testimony, along with DeLorean's, the detectives', and the clerk's testimony regarding only defendant's actions were sufficient to prove beyond a reasonable doubt that defendant committed the crimes he was accused of. Nicholas, supra; Crim.R. 52(B). Accordingly, the second assignment of error is overruled.
 {¶ 108} For his third assignment of error, defendant states:
 {¶ 109} "III. Comment upon appellant's post-arrest silence by police detectives during direct and cross-examination denied appellant a fair trial."
 {¶ 110} Defendant argues that the testimony of two different detectives that he refused to speak to them following his Miranda warnings violated his right to remain silent. Defendant fails to note that, in one instance, he had been speaking to the detectives and chose to stop, saying, "I'm not talking to you anymore." Tr. at 1438. This court has held that it is not error in this circumstance, when defendant has spoken after receiving his Miranda rights, for the police to state that defendant refused to continue speaking. Once defendant began speaking, he had waived his right to suppress anything he actually said. Although the state cannot comment on his subsequent silence, it is free to quote anything he did say and to use it against him.
 {¶ 111} In a similar case, the Supreme Court of Ohio explained, "[b]ecause [defendant] did not remain silent, but freely gave his alibi, it was proper to inform the jury that he refused to give details to corroborate that alibi." State v. Gillard (1988), 40 Ohio St.3d 226,231. Thus once defendant started talking, the state was allowed to present evidence of statements he made before he stopped talking. "If a defendant voluntarily offers information to police, his toying with the authorities by allegedly telling only part of his story is certainly not protected" by his Miranda rights. State v. Osborne (1977),50 Ohio St.2d 211, 216. The detective's comment concerning defendant's refusal to continue speaking was not error.
 {¶ 112} In the second instance of the police commenting on defendant's refusal to speak, defendant fails to note that this statement was invited error. Defense counsel directly asked the detective whether defendant said anything after he was given his Miranda rights on a second occasion when the detectives went to speak with him. The detective answered this question by saying that the defendant had refused to speak to them that time.
 {¶ 113} The Second District Court discussed a case in which defense counsel "actually introduced the evidence through his own witness. In this regard, it is significant that defendants in criminal cases are commonly permitted to waive rights which are more fundamental, more specifically guaranteed, and more jealously guarded by law, than any rule of evidence. Furthermore, the rule of `invited error,' a corollary of the principle of equitable estoppel, prohibits a party who induces error in the trial court from taking advantage of such error on appeal. See 5 Ohio Jurisprudence 3d, Appellate Review, Section 543 et seq." Statev. Woodruff (1983), 10 Ohio App.3d 326, 327. In the case at bar defendant elicited this testimony; therefore, he cannot complain about it now. This assignment of error is without merit.
 {¶ 114} For his fourth assignment of error, defendant states:
 {¶ 115} "IV. The sentence of the trial court is contrary to law."
 {¶ 116} Defendant claims that because he had never served a prison term, he should have received the minimum sentence.
 {¶ 117} When a defendant has never served a prison term, R.C.2929.14(B) requires that he be given the minimum sentence unless the trial court makes certain findings on the record: "that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." The trial court expressly made these findings when it said: "The Court finds that the shortest prison term will demean the seriousness of the defendant's conduct and will not adequately protect the public from future crimes by the defendant or others."
 {¶ 118} Defendant argues further that the court erred in failing to support its findings. The absence of reasons for the court's findings, however, does not affect the validity of the court's sentence. As the Supreme Court of Ohio stated in Edmonson: "R.C. 2929.14(B) does not require that the trial court give its reasons for its finding that the seriousness of the offender's conduct will be demeaned or that the public will not be adequately protected from future crimes before it can lawfully impose more than the minimum authorized sentence." State v.Edmonson (1999), 86 Ohio St.3d 324, syllabus. Defendant's claim, therefore, that the court erred in imposing more than the minimum sentence is without merit.
 {¶ 119} Defendant also argues that the court erred in imposing consecutive sentences. We disagree. The imposition of consecutive sentences is governed by R.C. 2929.14(E)(4), which states in pertinent part: "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following: (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense; (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct; (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
 {¶ 120} Additionally, the court is required to give reasons for its findings pursuant to R.C. 2929.19(B)(2)(c).
 {¶ 121} The trial court made all the necessary findings and gave its reasons for those findings at the sentencing hearing. For example, the court stated it found that "defendant committed multiple offenses while he was awaiting trial, and that the multiple offenses are so great and unusual that no single prison term for any of the offenses adequately reflects the seriousness of the offender's conduct; the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." Tr. at 2142-2143. The trial court made all the necessary findings on the record.
 {¶ 122} Additionally, the trial court gave its reasons for these findings: the court noted that defendant showed no remorse for his conduct, caused serious economic injury to the victims, damaged the professional reputations of the victims, and engaged in organized criminal activity. The court gave sufficient reasons for its findings that consecutive sentences were necessary. Accordingly, this assignment of error is overruled.
 {¶ 123} For his fifth assignment of error, defendant states:
 {¶ 124} "V. Improper conduct by the prosecuting attorney prejudicially affected appellant's substantial rights."
 {¶ 125} Defendant claims that a number of comments and questions by the prosecutor unduly prejudiced his trial. For example, the prosecutor asked him whether he was aware that another proponent of Redemptionism, about whom defendant had testified, had been sentenced to eight years in prison for passing documentary drafts like those presented to DeLorean. Defendant also objects to the prosecutor's line of questioning in which he asked defendant whether he was aware that the Department of Transportation had declared both him and his draft to DeLorean to be a fraud, especially because at that point no testimony had been presented to substantiate this assertion. Finally, defendant objects to the prosecutor's questioning defendant as to whether defendant was aware that his own brother had refused to post bond for him. Defendant argues that he was denied a fair trial because the prosecutor's tactics were "part and parcel of a pattern of character assassination which was evident in the testimony of almost every prosecution witness."
 {¶ 126} While we agree that this evidence regarding the comments of the attorney at the Department of Transportation was in error and that several of the prosecutor's other comments were improper, we note that the standard for reversing a case for prosecutorial misconduct is a high one: "A prosecutor's conduct during trial cannot be grounds for error unless such conduct deprives the defendant of a fair trial." State v.Williams, Stark App. No. 1998CA00060, 1999-Ohio-778, citing State v.Aponivitch (1987), 33 Ohio St.3d 19. The rhetorical questions the prosecutor asked were clearly outrageous. It is conduct more customary in television dramas than in Ohio courtrooms. Nevertheless, because the evidence in this case was overwhelming, the prosecutor's conduct, although improper, did not reach the very high standard necessary for reversal. This assignment of error is overruled.
 {¶ 127} For his sixth assignment of error, defendant states:
 {¶ 128} "VI. The trial court abused its discretion by not remaining detached and neutral thereby denying appellant due process of law."
 {¶ 129} Defendant claims that "at some point in the proceedings, the trial judge permitted his hostility for Appellant to intrude upon his neutral and detached demeanor." First, defendant claims that the trial court's refusal to allow his counsel to enter oral objections to the prosecutor's exhibits shows a bias against him.
 {¶ 130} Evid.R. 611 states in pertinent part: "The court shall exercise
 {¶ 131} reasonable control over the mode and order of interrogating
 {¶ 132} witnesses and presenting evidence so as to * * * (2) avoid needless
 {¶ 133} consumption of time * * *." Furthermore, "[c]hallenged statements and actions of the trial judge in a criminal case will not justify a reversal of the conviction, where the defendant has failed in light of the circumstances under which the incidents occurred to demonstrate prejudice." State v. Wade (1978), 53 Ohio St.2d 182, syllabus, paragraph 2.
 {¶ 134} The state presented well over 100 exhibits, and the court stated that to allow defense counsel to orally address each one would be inordinately time-consuming. Instead, the trial court directed counsel to submit written objections for the court to review. Defendant presented no law requiring the court to permit a lengthy list of oral objections. Moreover, the court allowed defendant to enter his written objections into the record for review. It did not have to allow the unnecessary waste of time by permitting each objection to be made orally.
 {¶ 135} Defendant also argues that the trial court's refusal to allow his counsel to argue his Crim.R. 29 motion for acquittal demonstrated a bias against him. Tr. 1462-1463. The court stated:
 {¶ 136} "Now I'm going to address the Defendant's Motion for Acquittal under
 {¶ 137} Rule 29. * * * I have heard the evidence in this case. And on behalf of the defendant, I'm entering a Motion for Acquittal under Rule 29 as to the various counts in the indictment in this case, and as such, and as the Judge in this case, I'm overruling that motion."
 {¶ 138} Tr. at 1463. This statement implies that the defense had discussed with the court a motion for acquittal, apparently not on the record. Later on in this exchange, defense counsel requested a mistrial both because the court refused to allow him to object to the exhibits orally and because the court did not permit him to argue in favor of his Crim.R. 29 motion.
 {¶ 139} Defendant had the opportunity to present his objections to the exhibits in writing. The court also, however, articulated the motion for the record and overruled defendant's Crim.R. 29 motion. Although it may have been a preferable procedure for the court to permit defense counsel to argue his case on this motion, the rule does not state that the court is required to do so. Crim.R. 29(A) states, in part: "The court on motion of a defendant or on its own motion, after the evidence of either side is closed, shall order the entry of a judgment of acquittal of one or more of the offenses charged * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."
 {¶ 140} "A motion for acquittal at the close of the state's case tests the sufficiency of the evidence. Pursuant to Crim.R. 29(A), a trial court must construe the evidence in a light most favorable to the
 {¶ 141} state and determine whether reasonable minds could reach different conclusions concerning whether the evidence proves each element of the crime beyond a reasonable doubt. State v. Bridgeman (1978),55 Ohio St.2d 261, 263, 381 N.E.2d 184. An appellate court undertakes a de novo review and will not reverse the trial court's judgment unless reasonable minds could only reach the conclusion that the evidence failed to prove all elements of the crime beyond a reasonable doubt. State v.White (1989), 65 Ohio App.3d 564, 568, 584 N.E.2d 1255. See, also, Statev. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus." State v. Milley (1996), 114 Ohio App.3d 738, 742. Again, because the evidence is overwhelming in this case, defendant was not prejudiced when his counsel was not permitted to argue in support of the Crim.R. 29 motion.
 {¶ 142} Finally, defendant claims that the court demonstrated bias and denied him a fair trial when it limited his testimony to less than two days. He argues that "[t]he court even refused a requested instruction on the apparent interruption of Appellant's direct testimony." Appellant's brief at 33.
 {¶ 143} At first blush it does appear that limiting a defendant's testimony in his own defense would be prejudicial. A court is charged, however, with controlling the trial and the testimony. A review of defendant's testimony shows that he was permitted to explain his theories supporting his actions. He was allowed to provide his educational and wide employment background in the financial and business world as the basis for arriving at his theories. Further, the court allowed him to describe the Diogenes Society and his role in it, to describe his version of the events leading to his arrest, and to present his reasons in support of his innocence. At the time the court terminated his testimony, however, defendant was moving into repetitious testimony regarding the state's exhibits. He was continuing to deny that each of the state's exhibits was a fraudulent document or that his use of those documents and subsequent actions constituted a pattern of corrupt activity.
 {¶ 144} It is clear that if allowed to continue, defendant's direct testimony could have lasted for days. Because the trial court is charged with controlling the proceedings, the court properly limited what could have been endless testimony. Defendant, furthermore, has failed to specify what testimony was prohibited and how its omission specifically prejudiced him.
 {¶ 145} Even if the trial court's limitation of defendant's testimony was an error, it did not affect the outcome of the case, and is therefore harmless error. In his testimony, defendant had already admitted to all the elements of the crimes charged, and nothing he could say in explanation could change his conviction. The sixth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., P.J. CONCURS; COLLEEN CONWAY COONEY, J., CONCURS IN JUDGMENT ONLY.
[1] Because defendant was from California and had no ties to Ohio, he was considered a flight risk. His bond, therefore, was twice as high as his co-defendants' bonds.
[2] Defendant filed his UCC-1 financing statement in the state of Washington because California would not recognize it. The state of Ohio also rejects a financing statement which names the same person as the debtor and the creditor.
[3] Defendant himself provided an extensive and thorough explanation of the theory of Redemptionism, so the court does not need to rely on Pitcavage's testimony.